### UNITED STATES v. RICE GROWERS ASS'N OF CALIFORNIA et al.

### No. 32880.

United States District Court
N. D. California, S. D.

Feb. 17, 1953.

Wallace Howland, Special Asst. to the Atty. Gen., Lyle Jones, Trial Atty., San Francisco, Cal., Chauncey Tramutolo, U. S. Atty., for plaintiff.

Harold C. Faulkner, Wallace Sheehan and Harry M. Creech, San Francisco, Cal., for defendants Rice Growers Assn. of Cal., Harry M. Creech and William Crawford.

Joseph L. Alioto, San Francisco, Cal., for defendants Rice Growers Assn. of Cal., and George W. Brewer.

Jerome B. White and Raymond L. Sullivan, San Francisco, Cal., for defendant Rosenberg Bros. & Co., Inc.

Edward D. Bronson, San Francisco, Cal., for defendant C. E. Grosjean Rice Milling Co.

OLIVER J. CARTER, District Judge.

Defendants were indicted for having wilfully and knowingly conspired together to defraud the United States and the Commodity Credit Corporation, an agency of

the United States, in violation of 18 U.S.C. § 371, and for having wilfully and knowingly concealed by trick, scheme and device a material fact in a matter within the jurisdiction of the Commodity Credit Corporation, in violation of 18 U.S.C. § 1001. Evidence has been introduced by the government, and at the conclusion of this phase of the trial, each of the defendants has moved, under Rule 29(a) of the Federal Rules of Criminal Procedure, 18 U.S.C., for a judgment of acquittal.

Each of these motions is urged upon the same two grounds. It is argued that the evidence offered by the government can not, as a matter of law, establish the guilt of the defendants of the crimes charged beyond a reasonable doubt. The other ground is the contention that the facts which the government seeks to prove in this case have been conclusively determined in favor of the defendants in a prior adjudication of this court and are, as between the government and these defendants, res judicata. The prior adjudication to which reference is made is a verdict of acquittal rendered in the case of United States v. Rice Growers Association of California, et al., Criminal No. 32879.*

The transaction which is the nucleus of the indictment was a sale of a quantity of rice to Commodity Credit Corporation. Before discussing the transaction itself it would be well to first identify all who had any connection with that transaction.

First there are the defendants. Rice Growers Association of California, hereinafter referred to as RGA, is a cooperative corporation, formed and existing under the laws of the State of California. From undisputed evidence offered by the government, certain facts about RGA were established. It is a comparatively large cooperative marketing association, composed of more than 700 members, all of whom are growers of rice. It is the largest cooperative engaged in the marketing of rice in the United States. Each year its business operations involve the sale of tremendous quantities of rice for many millions of dollars.

Rosenberg Bros. & Co., Inc., hereinafter called Rosenberg, and C. E. Grosjean Rice Milling Company, hereinafter called Grosjean, are corporations who engage commercially in the milling and sale of rice. William Crawford is a commercial rice miller doing business under the trade name and style of Woodland Rice Company, hereinafter called Woodland. George W. Brewer, Oscar F. Zebal, and Ralph Crowe are officials of the various corporate defendants. The government entered a nolle prosequi on November 16, 1951 as to Crowe. Harry M. Creech is chairman of a voluntary and unincorporated trade association of California rice mills called California Rice Exporters, which has among its members officials and representatives of RGA, Rosenberg, Grosjean and Woodland.

On the government side of the case, there are involved several agencies of the United States. Commodity Credit Corporation, hereinafter referred to as CCC, is a corporation and an agency of the United States, organized and existing under the laws of the United States. CCC exists within the Department of Agriculture and is concerned with agricultural commodities, their prices and farm income. 15 U.S.C.A. § 714. Among the powers of CCC are the support of prices of agricultural commodities through loans and purchases, 15 U.S.C.A. § 714c(a), and the procurement of agricultural commodities for sale to other government agencies and to foreign governments, 15 U.S.C.A. § 714c(c).

Production and Marketing Administration, hereinafter referred to as PMA, is another governmental agency existing within the framework of the Department of Agriculture. It acts as the agent of CCC in the negotiation and formation of contracts for the purchase, by CCC, of agricultural commodities. It also receives, and accepts or rejects, agricultural commodities sold to CCC.

The subject matter with which these parties dealt was rice. This opinion will discuss two kinds of rice. First, there is paddy rice, which is also called rough rice. Paddy rice is rice in the form in which it

---

* No opinion for publication.

comes from the fields, before it is polished or otherwise milled or processed. Second, there is milled rice, which is rice that has been polished in order to put it into a state in which it is usable as food.

Now as to the transaction itself. On January 26, 1949, RGA entered into an option agreement with CCC. This agreement was called a "Purchase Agreement" and was executed upon a prepared government form. Pursuant to its terms, RGA paid to CCC the sum of $6,000 in return for which it acquired the right to sell to CCC any quantity up to and including 600,000 bags of paddy rice at a price to be determined by an ascertained formula, provided that the right was exercised within 30 days following April 30, 1949. The method by which the right to sell was to be exercised was that RGA should notify a PMA County Committee of an intention to sell a specified quantity and to request delivery instructions therefor. After issuance of delivery instructions by the County Committee, RGA was required to deliver the rice within 15 days, unless the County Committee determined that more time was required for delivery.

On May 26, 1949, RGA notified the County Committee that it desired to sell the maximum quantity of rice allowable under the option agreement and requested delivery instructions. Contemporaneously with this action, defendant Brewer, the General Manager of RGA, wrote a letter to Mr. Fred Entermille, Assistant Director of the Grain Branch of PMA, in Washington, D.C. This letter was a confirmation and written summary of the substance of a prior telephone conversation between the two to the effect that it was understood between the parties that RGA would continue to sell on the open market rice from that quantity covered by the agreement, and that no delivery instructions would be issued as to this rice without the consent of RGA.

Other action taken by RGA on May 26, 1949, was the execution of option agreements with Rosenberg and Woodland, two of the defendants who are commercial millers. These options gave RGA the right to purchase from each of the commercial millers a quantity of rice not to exceed a speci-fied percentage of the volume of rice which RGA might deliver under its purchase agreement with CCC. The agreements required delivery of any rice sold under these agreements to RGA, and the options to buy were to be exercised by RGA by notifying the respective seller within five days after receiving delivery instructions from CCC.

Time passed, and as of July 22, 1949, no delivery instructions for rice had yet been issued to RGA. During the interim period between May 26 and July 22, Entermille, on behalf of PMA, had conversations relative to the purchase by CCC of the rice under the purchase agreement with RGA, with Brewer, on behalf of RGA, and Creech, who was considered by PMA as a source of expert information on the California rice market. These conversations dealt with the possibility of CCC buying rice for ECA to send to China under the existing purchase agreement with RGA and with the idea of changing the pending purchase transaction between RGA and CCC from one for paddy rice to one for milled rice. On July 22, 1949, headquarters of PMA in Washington instructed the San Francisco PMA office to enter into an agreement with RGA to assemble the paddy rice covered by the purchase agreement, to mill that rice, and then deliver it to PMA.

Conferences were then held between representatives of PMA and RGA relative to the formation of such an agreement. The instrument which contained the agreement which was formed was drawn up by an attorney of the staff of PMA. This instrument, which was a contract for the sale, by RGA to CCC, of milled rice, was executed on July 26, 1949. On the same day delivery instructions were issued, which instructions were amended on the next day to correctly conform to the agreement. Thereafter, rice was milled in the mills of RGA, Rosenberg, Grosjean and Woodland, and delivered from these respective mills to the point designated by PMA. The rice which was milled by the commercial millers was billed to RGA, and after RGA had collected for the rice from CCC, it paid the commercial mills the same price which it had been paid, plus the cost of transportation. All documents

accompanying the rice were issued in the name of RGA, and waybills under which rice was shipped from the commercial mills showed the place of shipment as having been not from such mills, but from the mill of RGA.

The question raised by the instant motions is whether or not there is sufficient evidence to allow a reasonable man to conclude that the defendants are guilty of the crimes with which they are charged. With respect to the first count of the indictment, guilt would be established by evidence sufficient to establish a conspiracy on the part of defendants to defraud CCC by selling to it under the 1948 Rice Price Support Program rice which was not eligible for purchase thereunder. As to the second count of the indictment, guilt rests upon the establishment of evidence sufficient to show that, in connection with the sale of the rice to CCC, the defendants concealed from CCC the fact that part of the rice sold and delivered was from the mills of Rosenberg, Grosjean and Woodland, and also that such was a material fact in connection with that transaction.

The conspiracy count will be examined first. Before reviewing the evidence, it is well to briefly examine the conspiracy doctrine in order to guide and expedite that review. One of the most lucid comments on that doctrine to be found among the modern cases was made by Mr. Justice Jackson in his concurring opinion in Krulewitch v. United States, 336 U.S. 440, 445–458, 69 S.Ct. 716, 93 L.Ed. 790. Certain of the language of that opinion is particularly appropriate to the matter now before the court, to wit:

"The modern crime of conspiracy is so vague that it almost defies definition. Despite certain elementary and essential elements, it also, chameleon-like, takes on a special coloration from each of the many independent offenses on which it may be overlaid. It is always 'predominantly mental in composition' because it consists primarily of a meeting of minds and an intent." 336 U.S. at pages 446–448, 69 S.Ct. at pages 720, 93 L.Ed. 790.

"Conspiracy in federal law aggravates the degree of crime over that of unconcerted offending. The act of confederating to commit a misdemeanor, followed by even an innocent overt act in its execution, is a felony and is such even if the misdemeanor is never consummated. The more radical proposition also is well-established that at common law and under some statutes a combination may be a criminal conspiracy even if it contemplates only acts which are not crimes at all when perpetrated by an individual or by many acting severally." 336 U.S. at page 449, 69 S.Ct. at page 721.

"Thus the conspiracy doctrine will incriminate persons on the fringe of offending who would not be guilty of aiding and abetting or of becoming an accessory, for those charges only lie when an act which is a crime has actually been committed." 336 U.S. at page 450, 69 S.Ct. at page 721.

" * * * No statute authorizes federal judges to imply, presume or construct a conspiracy except as one may be found from evidence." 336 U.S. at page 457, 69 S.Ct. at page 724.

The indictment does not allege that the United States or its agency, CCC, has suffered any pecuniary loss from the conspiracy with which defendants are charged. It is not alleged that CCC received less than the bargain called for, as to quantity, quality, or otherwise. Instead, the fraud is said to stem from an impairment of the administration of the functions of CCC in purchasing rice under the 1948 Rice Price Support Program. Such an allegation states an offense within the meaning of 18 U.S.C. § 371. See Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569; United States v. Soeder, D.C.W.D. Mo., 10 F.Supp. 944, 946. The gist of the offense, as charged, is that the defendants conspired to sell to CCC under the 1948 Rice Price Support Program rice which was not eligible for purchase thereunder. It is the theory of the government's case, as reflected by the indictment and evidence, that either the commercial mill-

ers, in the capacity of undisclosed principals, sold rice to CCC, through their common agent, RGA; or, that, even though the rice which CCC bought was in fact sold by RGA, that such rice was ineligible for purchase under the price support program because it had been purchased by RGA from commercial millers.

In view of the language of the indictment, a good point of beginning for this inquiry might be a determination of what is meant by "the 1948 Rice Price Support Program" and by "eligible producer" and "eligible rice." The statute which authorizes governmental price support for rice grown in the year 1948 is The Agricultural Act of 1948, P.L. 897, 80th Cong., 2d Sess., 62 Stat. 1247. That statute authorized the Secretary of Agriculture to support prices received by producers of rice marketed before June 30, 1950. The statute did not specify the means by which the Secretary was to accomplish such price support. The Commodity Credit Corporation Charter Act,[1] 62 Stat. 1072, 15 U.S.C.A. §§ 714–714o, gives CCC the power to "Support the prices of agricultural commodities through loans, purchases, payments, and other operations."

The term "1948 Rice Price Support Program" had its origin in regulations issued August 31, 1948 by CCC. 6 C.F.R. 225.201–225.224. Those regulations were designated by CCC as "Rice Bulletin No. 1" which is hereinafter referred to as "the Bulletin." Under the sub-title, "1948 Rice Price Support Program Bulletin," the Bulletin contained the following introductory paragraph:

"This bulletin states the requirements with respect to the 1948 Rice Loan and Purchase Agreement Program formulated by Commodity Credit Corporation (hereinafter referred to as CCC) and the Production and Marketing Administration (hereinafter referred to as PMA). Loans and purchase agreements will be made available to producers and cooperative marketing associations of producers (hereinafter referred to as the producer) on eligible rice in accordance with this bulletin."

Separate sections of the Bulletin define "eligible producer" (Sec. 225.204) and "eligible rice" (Sec. 225.205). Thus, the entire meaning as to what was "the 1948 Rice Price Support Program" and as to who were "eligible producers" and what was "eligible rice" under that program is to be determined from the Bulletin.

Initially, the transaction which is here under consideration, involved, on the selling side, only RGA and its general manager, George Brewer. There is no evidence to connect any of the other defendants with the transaction before May 26, 1949. On that date, option agreements were executed by Rosenberg and by Woodland, giving RGA the right to buy from each, specified percentages of any amount of rice which it might elect to deliver to CCC under the existing purchase agreement. These were perfectly lawful agreements. Rosenberg and Woodland had a right to sell rice to RGA for resale to CCC under the price support program, and RGA had a right to buy rice from such sources for resale to CCC under the existing purchase agreement for paddy rice. Such purchases and resale on the part of RGA would not render it an "ineligible producer" within the meaning of the Bulletin, nor would the rice so purchased and resold thereby become "ineligible rice." The contention of government counsel that rice once owned by commercial millers (who did not themselves produce such rice) can never, though resold to an "eligible producer," be eligible for purchase by CCC under the price support program, is entirely erroneous. Equally erroneous is the government argument that once RGA had notified PMA that it intended to sell rice under the purchase agreement it could not thereafter obtain from other sources rice for sale under such agreement. Neither the statute nor the Bulletin is susceptible to such a restricted and strained construction.

1. This Act was enacted by the same session of Congress which enacted the Agricultural Act of 1948. The latter was enacted on July 3, 1948, whereas this Act was enacted on June 29, 1948.

The requirements for eligibility of a co-operative marketing association for a purchase agreement are set out in Sec. 225.204 of the Bulletin, which so far as material, provides:

"Cooperative marketing associations of producers shall be eligible for loans and purchase agreements: *Provided,* That: (a) the grower members are bound by contract to market through the association; (b) the major part of the rice marketed by the association is produced by members who are eligible producers; (c) the members share proportionately in the proceeds from marketings according to the quantity and quality of rice each delivers to the association; (d) the rice purchased from non-members is segregated sufficiently to assure that the rice placed under loan or delivered under a purchase agreement shall accurately reflect the quantity and quality of rice grown by grower members; and, (e) the association has the legal right to pledge or mortgage the rice as security for a loan."

The evidence is undisputed that RGA fulfilled the requirements of subdivisions (a), (b), and (c) of this Section. While the transaction here involved the large quantity of 600,000 bags of rice, the record establishes that RGA marketed 2,760,000 bags of paddy rice for its producer members during the 1948 rice crop year, and that it marketed 17,000 to 18,000 bags of paddy rice for non-members in additon to the rice which is the subject of this case.

There is nothing contained in this Section which renders a cooperative marketing association ineligible for a purchase agreement because it obtains rice from sources other than grower members. On the other hand, the regulations contemplate such activity, as is illustrated by subdivisions (b) and (d) of Sec. 225.204. Further fortifying this conclusion is the language of subdivision (c) of Sec. 225.205 of the Bulletin, which, in setting forth the requirements for eligibility of rice for sale under a purchase agreement, provides:

"(c) Except in the case of eligible cooperative marketing associations of producers, the beneficial interest in the rice must be in the producer tendering the rice for loan or purchase and must always have been in him, or must have been in him and a former producer whom he succeeded before the rice was harvested."

This language indicates that a cooperative marketing association could, under a purchase agreement, tender rice in which it did not hold the beneficial interest or rice in which it had acquired the beneficial interest after harvesting.

Nor is there anywhere in the Bulletin any restriction upon the sources from which a cooperative marketing association can obtain rice for sale to CCC under a purchase agreement. In the absence of any such restriction, the most logical and reasonable interpretation is that an eligible cooperative marketing association could sell, under a purchase agreement, rice obtained from any source, including a commercial miller, so long as the rice was otherwise eligible.

It is to be noted that the eligibility requirements for a cooperative marketing association to sell under a purchase agreement are phrased in terms of general organizational and operating procedures. They mean that such an association must be organized in a certain manner and that business operations must be conducted in a certain manner in order to be eligible. These requirements have reference to over-all operations and not to particular transactions, except, perhaps, for subdivisions (d) and (e) of Sec. 225.204. Subdivision (d) requires that a quantity of rice sold under purchase agreement, if such quantity is made up of some rice grown by grower members and of some purchased from non-members, reflect accurately the component quantity and quality of such larger quantity of rice as was grown by grower members. Subdivision (e) refers to particular loan transactions, but has no reference to purchase agreements.

The eligibility requirements for rice sold under purchase agreements do, of course, refer to particular transactions. However, the only requirement pertinent to this discussion is:

"§ 225.205 *Eligible rice.* Eligible rice shall be rough rice produced in 1948 * * *."

It is not possible to torture from these regulations a construction requiring the cooperative marketing association to have title to rice to be sold under a purchase agreement at any time prior to passage of that title to CCC under such purchase agreement. The evidence is clear that under the purchase agreement between RGA and CCC title to the rice was not to pass until delivery and acceptance of such rice. And the undisputed facts are that RGA, even after it had given notice of an intention to sell under the purchase agreement, was not obligated to sell or deliver any rice to CCC, and that CCC had agreed not to issue any delivery instructions for any amount of rice without obtaining the prior consent of RGA to do so. All this being true, it naturally follows that RGA had a right to sell under the purchase agreement rice which it had purchased from commercial millers after May 26th, the date of declaration of intention to sell thereunder.

The Bulletin was drawn up by CCC. That agency itself set up the requirements for eligibility for a purchase agreement under the price support program and for rice to be sold under such an agreement. The words which express those requirements for eligibility are the words of CCC, and they are unambiguous.[2] It is rather anomalous, to say the least, for CCC to now say that it was defrauded because the regulations do not mean what they say, but instead mean something else. Indeed, the attempted interpretation of the Government would render the Bulletin subject to the attack that the language was so vague and ambiguous that it could not be the basis for the foundation of criminal responsibility. See Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495.

The significant fact, however, is that RGA and CCC did not go through with the original purchase agreement, which called for the sale of paddy rice. The contract of July 26, 1949 was a substantial modification of all prior contractual rela-

2. The choice of language in setting up the requirements for eligibility for a purchase agreement was that of CCC. Had it so desired it could have stated in the Bulletin that rice purchased from commercial millers was ineligible. Or the regulations could have been so drawn as to render ineligible rice purchased after notification of an intention to sell under a purchase agreement.

Contrast, for example, the language of CCC's later regulations, contained in Grain Price Support Bulletin 1, Supplement 1, Rice, published in the Federal Register of August 10, 1950.

"§ 601.372(e) (3) The following special conditions of price support shall apply to cooperative marketing associations of producers:

"(i) The association must maintain a record of the total quantity of rough rice acquired by or delivered to the association from all sources and a separate record of the quantity of eligible rice delivered to the association by eligible producer members. The books of such associations shall be made available to CCC for inspection at all reasonable times.

"(ii) Eligible rice placed under loan by the association must be stored sepa-

rately from all other rice and kept separately stored until redeemed from the loan or delivered to CCC.

"(iii) Eligible rice delivered by the association to CCC under purchase agreements must represent the average quality of eligible rice delivered by eligible producers as shown in the records of the association.

"(iv) The total quantity of rough rice delivered to CCC by a cooperative marketing association under loans and purchase agreements may not exceed a quantity determined by multiplying the quantity of rough rice in the inventory of the association on April 30, 1951, by a factor determined (by or under the direction of the PMA State Committee) by dividing the total quantity of eligible rice received from eligible producer members by the total quantity of rough rice received by the association from all sources during the period August 1, 1950, through April 30, 1951; except that this limitation shall not operate to reduce the quantity of rice under loan which may be delivered to CCC, below the quantity of eligible rice actually under loan by the association on April 30, 1951."

tions between RGA and CCC. It changed the entire nature of the transaction through which CCC purchased rice from RGA. Whereas the earlier arrangement had called for a sale of paddy rice, the July contract *called for a sale of milled rice.* The government's contention that the contract is divisible, so far as performance by RGA is concerned, into a sale of paddy rice on the one hand, and the furnishing of the service of milling that paddy rice on the other, is completely without merit.

The contract, which is government exhibit 52, speaks for itself. By the express terms of that instrument, *title was not to pass from RGA to CCC until the milled rice was delivered.*[3] The terms of the contract further provide that if any of the milled rice should not come up to contract grade, RGA was to receive no compensation for the milling thereof or for any other service performed in connection with such rice.[4] Other evidence indicates that RGA was to retain ownership of all materials resulting from the milling of the paddy rice except head rice and broken heads. The milling process produces, in addition to head rice and brokens, second heads, screenings, bran and brewer's rice.

The July contract permitted RGA to deliver Grade 5 rice, or lower, if such low grading resulted from a high percentage of broken heads present in such rice, whereas the former agreement relating to the sale of paddy rice required that only rice of Grade 4, or higher, be delivered.[5] There is also evidence that the two standards of grading rice, the one for paddy, and the other for milled, are different.

Though the July contract provided for separate payment for paddy rice, and separate payment for milling, the amount of paddy rice for which payment was to be made was to be determined—not by measuring the paddy itself, as would have been done under the original purchase agreement—but by computing from the milled rice delivered that volume of paddy which would have been required to produce such a quantity of milled.[6]

As pointed out above, the Bulletin, in setting up requirements for rice which is eligible for purchase by CCC under the price support program, refers only to paddy rice.[7] Thus, the rice which was in fact sold and delivered to CCC was not eligible, within the meaning of the Bulletin, for purchase under the price support program.

The indictment does not charge the defendants with a substantive offense of selling ineligible rice to CCC. Indeed, the Government concedes that there is no such substantive offense. The indictment does not allege that defendants fraudulently induced CCC, or its agents, to enter into the contract of July 26th, and there is no evidence to support such an allegation were it there. There is no evidence of agreement between defendants to try to persuade PMA officials to take milled rice instead of paddy rice under the purchase agreement. Instead, all the evidence is that it was PMA who came to RGA and asked to receive milled rice instead of paddy rice under the agreement. At this point in the negotiations CCC was obligated to take paddy rice, but was not obligated to take milled rice. Had delivery instructions then been issued

3. "13. Title to the rice shall remain in Association, together with the risk of loss thereto, until delivery f. o. b. dock, pursuant to instruction from Commodity."

4. "11. Milled rice which grades No. 5 or lower because of factors other than brokens will not be eligible for purchase by Commodity or the State and County Committee of PMA, nor shall Association be entitled to payment for any services rendered in connection with such rice."

5. Contrast language of note 4, supra, with that of subdivision (b) of § 225.205 of

Bulletin (specifying requirements for eligibility of rice), which, so far as material, provides: "Such rice shall grade U. S. No. 4 or better;".

6. "8. Commodity will purchase the rough rice on the basis of the milled outturn of head rice and broken rice as evidenced by copies of weight tickets and Inspection Certificates of the milled rice."

7. The Bulletin states, "Eligible rice shall be rough rice * * *" "Paddy Rice" and "rough rice" are synonyms, as was pointed out in text.

RGA could not have forced CCC to purchase by tendering milled rice.

The contract under which the rice was sold was drawn by a government attorney. It was the result of prolonged negotiation between the parties thereto. It was officials of the government agency who proposed the provision which gave the rice any taint of ineligibility for purchase under the program which it may have. It was the government agency which insisted that title to the rice being purchased remain in RGA until the final product, the milled rice, was delivered to it. The only delivery instructions which were ever issued by the government agency were for milled rice, not for paddy rice. Under these circumstances, it cannot be said that the lone fact that the rice sold and delivered was ineligible, within the meaning of the Bulletin, is evidence of a conspiracy on the part of defendants to defraud a government agency by selling such ineligible rice to it.

The statute which authorized the Secretary of Agriculture to support the prices paid to producers for rice did not restrict his activities in connection with such support to the program set up by the Bulletin. And, CCC had the general power to support the price of rice by purchases without reference to any particular agency-created program. Therefore, CCC had the power to purchase rice for the purpose of carrying out a Congressional policy of price support, other than in conformity with the regulations stated in the Bulletin.

The provision in the contract of July 26th requiring RGA to submit to CCC documents evidencing compliance with the Bulletin [8] creates no inconsistency with what has been said so far in connection with the construction of that contract. The execution of the contract itself made it impossible for RGA to fully comply with the terms and conditions of the Bulletin. For instance, it could not comply with the requirement of delivering paddy rice under the purchase agreement if the contract called for the delivery of milled rice. Therefore, a reasonable interpretation of that provision is that it required RGA to evidence compliance with such of the terms and conditions of the Bulletin as were not inconsistent with the contract in which that provision is found.

The fact that the major portion of the rice sold to CCC was milled in commercial mills instead of the mills of RGA does not tend to show the conspiracy charged. RGA had a right to buy the rice from the commercial millers to resell to CCC under the July contract. Whether or not RGA took title to the paddy rice from the commercial millers before the rice was milled is immaterial, for it was action on the part of officials of the government agency which obviated the necessity of that step.

CCC is not above the operation of the logical rule that one cannot have his cake and eat it too. CCC could have purchased paddy rice and thereafter had that rice milled, had it desired to do so. Instead it asked for and received milled rice, and, by the terms of the contract of sale, refused to accept delivery of anything but milled rice. Under such circumstances the milling of some of the rice purchased by CCC in, and the shipment of such rice from, mills of commercial millers does not tend to show the conspiracy charged.

If the preparation of documents which accompanied the rice in the name of RGA or the furnishing of waybills showing the point of shipment for all rice to have been from the mill of RGA can be said to be a concealment of a fact in connection with the transaction, it was a concealment of an immaterial fact. RGA had a right to buy from commercial mills the rice sold to CCC. It had a right to have rice purchased by it from commercial millers delivered to CCC for its account. It had a right to use the employees of the commercial millers as its agents in assembling, milling and ship-

8. "14. Association shall deliver to Commodity scale weight tickets for the rough rice, weight tickets and Inspection Certificates for the milled rice, a sworn statement from Association that the provisions of Paragraph 225.204 of Rice Bulletin 1, dated August 1, 1948 have been complied with, and such other documents as Commodity shall require evidencing compliance with the terms and conditions of this agreement, the purchase agreement and CCC Rice Bulletin 1.

ping the rice. The fact that some rice was shipped from San Francisco, California, some from Woodland, California, and some from Biggs, California, accompanied by waybills which said it had been shipped from West Sacramento, California, is not such a concealment as will establish a conspiracy to defraud CCC. In so far as eligibility is concerned, either of RGA to sell, or of the rice itself, it made no difference where it was milled or from where it was shipped.

The milling of part of the rice purchased by CCC in the commercial mills and shipment therefrom no more tends to prove agency on the part of RGA in negotiating the sale and receiving and distributing the payment therefor, than it tends to prove agency on the part of the commercial millers in milling or in shipment, or in both. Therefore it must be assumed that defendants acted lawfully, and that the seller, in both a nominal and legal sense, was RGA.

■■ Therefore, it is the conclusion of this court that the evidence, as a matter of law, is insufficient to establish the conspiracy charged in count one of the indictment. Count two charges the defendants with having concealed and covered up the fact that some of the rice sold came from the mills of Rosenberg, Grosjean and Woodland. In order for this concealment to be a crime within the terms of 18 U.S.C. § 1001, under which defendants are indicted, it must be a material fact. For the reasons discussed above, it was not material to this purchase of rice by CCC whether the rice came from the mills of these commercial millers or not. Materiality could attach to such fact only if that fact affected the eligibility of the rice for purchase. As pointed out above, who milled the rice or where it was shipped from makes no difference with respect to eligibility. Thus, it is concluded that the evidence is also insufficient to sustain the charge of count two of the indictment.

The decisions reached in this opinion could not have been made in connection with a motion to dismiss the indictment. The purchase agreement and the contract under which the rice was purchased were not a part of the record until introduced as evidence. But these documents are now before the court, as is testimony concerning the circumstances surrounding their execution and performance, thus enabling the court to obtain a full picture of the transaction which is said to evidence crimes on the part of defendants.

Because it has been concluded that the evidence in insufficient to support a verdict of guilt of the defendants, it is unnecessary to consider the res judicata argument offered by defendants.

For the reasons stated, the motions of defendants for judgments of acquittal should be, and each of them is, granted.