**Del L. BRANDOW, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15615.**

United States Court of Appeals
Ninth Circuit.

June 24, 1959.

Rehearing Denied Aug. 25, 1959.

William John Hyland, III, Beverly Hills, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Norman W. Neukom, Robert John Jensen, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This prosecution grew out of an investigation being conducted by the Internal Revenue Service of the U. S. Treasury Department concerning the activities of a former agent of that service, a Mr. Charles D. Ford, appellant Bran-

dow and Attorney William C. Rau, with respect to their endeavor to be engaged by one Delta Boren of San Diego to represent her and her husband, Clifford Boren, and their construction corporation in a matter pertaining to alleged fraud on the part of the Borens as to their income tax for the years 1950 and 1951.

Appellant was indicted for an alleged violation of 18 U.S.C. § 1001. It was charged that on October 26, 1954, he "did willfully and knowingly make false and fraudulent statements and representations in a matter within the jurisdiction of a department and agency of the United States, by signing an affidavit before * * * [two] * * * special agents of the Internal Revenue Service of the Treasury Department of the United States at Los Angeles, California, in the Southern District of California," which affidavit stated "that at no time during the discussions at Mrs. Boren's house did Mr. Ford or anyone else state directly or imply that Mr. Ford was willing to disclose the government's case" against Mrs. Boren for income tax evasion, and further stated:

"[T]hat Charles D. Ford at no time discussed the tax features of the Boren case with him, whereas,

as he then and there well knew, he (Del L. Brandow) did state and imply during the conversation at Mrs. Boren's house on September 15, and September 28, 1954, that Ford had disclosed the Government's case to him and that Ford was willing to disclose it for Mrs. Boren's benefit."

The case was tried before a jury, which acquitted the appellant on Counts 1 and 5, and convicted on Count 2. The lower court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction on appeal. 28 U.S.C. §§ 1291, 1294.

Appellant urges as error: (1) The statement was not made in any matter within the jurisdiction of any department or agency of the United States; (2) the affidavit (Ex. 65) was immaterial; (3) error in the introduction of tape recordings without a proper foundation; and (4) insufficiency of the evidence to support the verdict.

Appellant's statement of the case is so brief and insufficient that we adopt the appellee's statement, with certain corrections and omissions, particularly omitting those references to evidence marked for identification but *not* introduced into evidence.[1] We agree with appellant that such evidence, including Ex-

---

1. The record reveals that for some period of time prior to the fall of 1954, that Mr. Brandow was engaged in the business of an auditor, devoting much of his time to income tax matters, that he was a "tax analyst," that "I assist taxpayers in determining their tax liability." He was known as a tax specialist and started such business in 1932 and had been very active in such business since—"in the early forties."

A codefendant to certain counts of the instant indictment was one Charles D. Ford. Ford was found not guilty in all counts wherein he has been charged as a defendant, i. e., Counts I, IV and V. Ford had been with the Internal Revenue Service since August 8, 1945, except for an interval of about one year, and had left such Service about September 10, 1954. Among Ford's duties with the Internal Revenue Service while he, Ford, was assigned to the San Diego office was a case concerning the Boren tax matters, which case he had taken over from Revenue Agent Henry Miller about February

of 1954. Mr. Ford gave certain testimony as to what work he had done on the Boren tax matters while employed by the Internal Revenue Service. It was developed that the Boren tax matters concerned the wife, Delta Boren and her husband, Clifford Boren and later he, Ford, was assigned to investigate the Boren Corporation returns. Former Agent Ford testified that he estimated the time he was on the Boren investigation to be but seven days, and his last day of duty in Internal Revenue Service was September 10, 1954.

Mrs. Delta Boren testified that she was aware that an investigation was being conducted by the Internal Revenue Service, of hers and her husband's income tax affairs for the years 1950 and 1951, and that the first time she talked in person to Mr. Ford was about September 14, 1954; but that prior to that, that is, about September 8, 1954, she had tried to reach Mr. Ford, over the telephone but had been unable to reach him. Mrs. Boren stated that Mr. Ford called her

hibit 29, should not have been printed in appellee's brief. A reading of what remains is necessary to understand the errors here urged.

by phone on September 13, 1954 and made arrangements to meet with her at her home in San Diego on September 14, 1954. Mrs. Boren stated that pursuant to advice of her attorney, a Mr. Jack Brant, they set up recording equipment in her home. This conversation between himself and Mr. Ford was recorded and the substance thereof was testified to by the witness Mrs. Boren.

This first recorded conversation did not include as a participant the appellant Mr. Brandow. A typewritten reflection of this conversation of September 14, 1954, between Mr. Ford and Mrs. Boren, was marked as Government's Exhibit 27 for identification only. Mrs. Boren stated that on the following day, September 15, 1954, she had another recorded conversation in her home between Mr. Brandow, Mr. Ford and herself—a typewritten reflection of this conversation, so recorded, was marked as Government's Exhibit 28 for identification. We pause to note that the recordations of September 14 and 15 were not too clear, hence they were not played to the jury. A later recordation of September 28, 1954 was much better, it was captured on a tape, which tape was played to the jury. The tape of the recording of September 28, 1954 was received into evidence as Exhibit 32. It was played to the jury, so they heard its contents. This recording, the tape, Exhibit 32, reflected a conversation at Mrs. Boren's home between former agent Ford, Mr. Rau and appellant Brandow that took place on September 28, 1954.

Mr. Rau, an attorney who was introduced to Mrs. Boren on September 28, 1954, was likewise convicted of a false statement count, i. e., Count III. Mr. Rau filed a notice of appeal but later dismissed or abandoned his appeal as the records on file herein will probably indicate.

It should be observed that Mrs. Boren caused the recordings to be made of these three conversations that took place at her home on September 14, 15 and 28, 1954, at the suggestion of her private counsel and not at the suggestion or instigation of any agent or representative of the government.

The affidavit executed by the appellant Brandow was charged to be a false statement, was received in evidence as Government Exhibit 65. This affidavit

## I—Jurisdiction.

Appellant's first point is that the statement of appellant taken in affidavit form by Internal Revenue Agents Sulli-

pertains to conversations taking place at Mrs. Boren's house on September 15 and 28, 1954.

Among other things, Mr. Brandow affirmed that Mr. Ford did not discuss the tax features of the case with him but only gave him background of the Borens and specifically stated in this affidavit:

"That at no time during the discussions I attended at Mrs. Boren's house did Mr. Ford or anyone else state directly, or imply, that Mr. Ford was willing to disclose the Government's case."

Mrs. Boren testified, with the assistance of the typewritten transcripts she had made from the recordings of such conversations, substantially as follows: [The one of September 15, 1954, whose participants were Mrs. Boren, Mr. Ford and Mr. Brandow.]

That on the afternoon of September 15, 1954, Mr. Brandow and Mr. Ford called at her home. That Mr. Ford described the discussion he had had with Mr. Brandow about the case. That during this conversation Mr. Ford stated he had discussed what he had done on the case, what the Government could do on the case, what could happen if affirmative action were taken, and that Mr. Brandow had seemed interested and felt he could help. That Mr. Brandow asked permission to ask certain questions that might be personal. That Mr. Brandow stated they did not handle cases for the average person, they only handled cases they knew they could win—that they felt they could win—didn't know whether they could get us off completely or not—but they felt they could do us a lot of help. Mrs. Boren further testified:

"Well, Mr. Brandow said that he understood that there had been unreported income, but that sometimes what the Government called income and what was truly income, by changing the evidence or straightening the facts out and making a better case, by the Government sometimes would not be considered income after all, that the Government wouldn't—wasn't fighting for us and they were fighting for themselves, and they wouldn't try to straighten some of these things out." That Mr. Brandow said, "Now is the time to kill the case before it got as far as indictment."—"Mr. Brandow even said they could get me off in a week." That Mr. Brandow repre-

van and Schlick, previously assigned by their superior to investigate charges brought by taxpayer, Mrs. Boren, against the activities of Mr. Ford, Mr. Brandow and Mr. Rau, concerned a subject matter *not* within the jurisdiction of an agency of the United States. This is without merit. The Internal Revenue Service is

sented that he had been with the F.B.I. That she, Mrs. Boren, had not known Brandow prior to September 15, 1954, the day he was brought to her house. That he represented the Government was going to prosecute—"And he (Brandow) stated they would get an indictment and a conviction, he was sure, unless we changed the evidence." That she stated she did not know anything about the case until Mr. Ford had come the day before and told us it was a fraud case.

That at one place in the conversation Brandow had said there would be fines as high—"as $5,000 for each count;"—"To say nothing of a year and day." That he told her they wanted fifty per cent of savings and that she believed Mr. Ford then told him it was about $110,-000 including everything. That Mr. Ford explained why he had joined up with Mr. Brandow—that they were a very good group, that he Ford had come up against them in his work in the Bureau and they had beat him several times; and he (Ford) felt if he couldn't beat them he would join them.

That Mr. Brandow stated: "The way I understand it from what Charlie (Ford) tells me, there was money that didn't get into the records"; that they discussed how evidence can be changed to show that sometimes this would work out anyway, because of certain ways they can set it up.

That Charlie (Mr. Ford) had asked Mr. Brandow to talk with her and they were interested in taking the case.

From Exhibit 32:

After Mr. Rau had made an extended remark regarding such as "you want to try and suppress it and limit it to civil liability don't you?" and that the tax is now "about a hundred and ten thousand"—and regarding changing evidence, etc., Brandow states: "I got it that in about two weeks they're (the Government) progressing at the set-up." Mr. Brandow later adds after Mr. Rau had stated to Mrs. Boren, "There's too much evidence of wilful fraud. That's all. No questions of income" that he (Brandow) came over here about a week ago after Charlie (Mr. Ford) asked him to come over and talk to Mrs. Boren. Brandow also stated: "You see Mrs. Boren, Charlie here, he has worked for the Government, he's familiar with the case." After considerable conversation between the parties, Mr. Brandow is reported to have stated to Mrs. Boren:

"Well, Mrs. Boren, here's the thing: to a certain extent you have a break due to the fact that Charlie just quit and associated with our company. Normally the Government doesn't come and tip you off what their hand is and Charlie isn't as the Government tipping you off, but he's trying to give you a chance." And later Brandow remarked:

"Well, I was just trying to tell Mrs. Boren that Charlie here is doing something for her that I don't think she appreciates * * * Charles feels sorry for you."

And again we hear from Brandow in this sequence:

Mr. Ford: "I know a couple of other contractors here in town who would just love to have the same deal but unfortunately I don't feel sorry for them."

Mr. Brandow: "Do you understand that? He's argued with us to come over here. Normally, you know, we don't have to do that and he's even willing to tip the hand. In other words, we got something this time that normally we have to feel around to get. We know what the case is all interested in."

Again Mr. Brandow remarks:

"We are interested in the ones that did, appear to be, which I honestly think you feel in your mind right now that uh, the Government's right because you, you're looking at cash, you're going to, you've got cash that hasn't been reported * * *"

And further he states:

"I mean, you're not just on the surface, you're, you're well, we'll say about three-quarters into the mess. The further in you go the harder it is to get out * * * I reviewed your case. I can see it, and it looks very bad at this stage * * *"

And in some state of modesty he states: "I haven't lost a case yet, and I wouldn't want to start now."

To conclude Mr. Brandow's participation, we call attention to this, his remark:

Mr. Brandow: "You may know more of the facts then we know, all we know is what the Government knows."

Mr. Brandow testified that he first talked to Mr. Ford on the afternoon of September 13, 1954. He, Brandow, relates the conversation he said he first

a part of the Treasury Department of the United States which is an agency of the United States government. Its agents are required to see that all internal revenue taxes are properly collected, that all laws and regulations pertaining thereto are "faithfully executed and complied with," and the agents are required to "aid in the prevention, detection, and punishment of any frauds in relation thereto." [2]

This statutory provision remained in effect until January 1, 1955,[3] a date subsequent to the date of the affidavit involved herein.[4] Thus, by statute the officers were entitled to seek the information sought, and appellant was under a legal obligation to give the information sought, subject to his constitutional rights.

■ But apart from statute, this Court and other courts have previously held that a false statement made to a Treasury agent is covered by 18 U.S.C. § 1001. Knowles v. United States, 10 Cir., 1955, 224 F.2d 168, 171–172; Cohen v. United States, 9 Cir., 1953, 201 F.2d 386, 394. Cf. De Casaus v. United States, 9 Cir., 1957, 250 F.2d 150; Marzani v. United States, 1948, 83 U.S.App.D.C. 78, 168 F.2d 133, 141–142, affirmed 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431.

United States v. Levin, D.C.D.Colo. 1953, 133 F.Supp. 88, differs from the instant case, because there no sworn statement was involved. But see Marzani v. United States, supra. Regardless of any alleged factual differences,

however, we decline to follow the reasoning of United States v. Levin, supra, or United States v. Stark, D.C.D.Md.1955, 131 F.Supp. 190, neither of which is binding on this Court. In reaching this conclusion, we prefer the reasoning of the later case of United States v. Van Valkenburg, D.C.D.Alaska 1958, 157 F. Supp. 599, as well as our earlier decisions herein cited, and our recent opinion of Pitts v. United States, 9 Cir., 1959, 263 F.2d 353.

## II—Materiality.

Appellant's statement respecting Mr. Ford's alleged willingness to discuss and to disclose the government's case to appellant is urged to be immaterial.

In support thereof appellant relies on three cases cited in his brief and one submitted subsequent to argument. They are Freidus v. United States, 1955, 96 U.S.App.D.C. 133, 223 F.2d 598; United States v. Moore, 5 Cir., 1950, 185 F.2d 92; United States v. Rice Growers Ass'n, D.C.N.D.Cal.1953, 110 F.Supp. 667; and United States v. Quirk, D.C.E. D.Pa.1958, 167 F.Supp. 462, 464.

In United States v. Moore, supra [185 F.2d 94], the court ruled that "statements charged to have been 'material' would have been material only if appellee was subject to the Act." There can be no doubt but that the Act in this case applied to *anyone* who "makes any false, fictitious or fraudulent statements or representations" in a matter we have already held was within the jurisdiction

had with Mr. Ford. That he was at Mrs. Boren's home on two occasions, *i. e.,* September 15 and 28, 1954. That on the second visit to Mrs. Boren's house he was accompanied by Mr. Rau. Mr. Brandow admitted that he recognized some of the conversation of the tape recording that had been played to the jury. That the signature on Exhibit 65, the affidavit, appeared to be his, Brandow's signature. When questioned concerning the conferences at Mrs. Boren's home, Mr. Brandow testified: "Well, Mr. Neukom, you know what I said or didn't say. You have the recordings. I don't recall it."

2. 53 Stat. 446, Int.Rev.Code of 1939, § 3654(c), 26 U.S.C. § 3654(c), reads as follows:
 "(c) *Internal revenue agents.* Every internal revenue agent shall see that all laws and regulations relating to the collection of internal revenue taxes are faithfully executed and complied with, and shall aid in the prevention, detection, and punishment of any frauds in relation thereto."

3. By virtue of § 7851(a) (6) (B) of the 1954 Code, 26 U.S.C. § 7851(a) (6) (B).

4. Cf., Levister v. United States, 1958, 104 U.S.App.D.C. 155, 260 F.2d 485.

of an agency of the United States. Appellant was thus subject to the Act, and the case is not in point.

Freidus v. United States, supra, and United States v. Rice Growers Ass'n, supra, squarely support the general proposition that 18 U.S.C. § 1001 is "highly penal," and must be construed in all its parts as applicable only to *material* falsification, i. e., false "statements that could affect or influence the exercise of a governmental function." [96 U.S.App.D.C. 133, 223 F.2d 601.] This requirement of materiality has been described as essential by the greater weight of authority, and for the purposes of this case, we approve and follow such majority rule.[5]

We then face the question, could the false statements have affected or influenced the exercise of a governmental function? In Freidus, the alleged false statement was held to be materially false only if it misrepresented a corporation's ability to repay a loan, which in turn rested upon whether its assets and liabilities had been properly stated, including the transfer of a loan into preferred stock, for the issuance of which stock no permit had been granted until after the financial statement had been submitted to the R.F.C. While the transfer was technically deficient because of a lack of a permit, the corporate action had been such as to "effectively subordinate" the loan, and hence the financial statements were found not to be materially false. Such facts are not similar to those here present.

In United States v. Quirk, supra, the defendant was accused of causing a lending institution to submit to the Veterans Administration a false application for insurance. Because the application was *rejected* by the Veterans Administration, appellant urged that the exercise of a government function could not have been influenced or affected by the admittedly false statements, and hence, they could not have been material. The court rejected this theory, and found the misrepresentation material, even though it recognized a "sharp conflict of opinion" as to whether the element of materiality is required by the second clause of § 1001.[6] It is noted the first clause of § 1001 contains the word "material," the second does not.

We agree with District Judge Kraft in United States v. Quirk, supra, when he says:

"[W]e believe that the conduct Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible. We think the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances."

167 F.Supp. at page 464. See also per curiam affirmance of Quirk, 3 Cir., 1959, 266 F.2d 26.

And we rule that the statements here found made by appellant were material and calculated to induce action or reliance by an agency of the United States government.

III—Admissibility of Evidence.

We find no error in the admission of the recording, Exhibit 32, covering the conversation of September 28, 1954. We understand appellant raises no question as to admissibility of recorded conversations generally,[7] but cites state court cases which set up differing rules as to what foundation must be laid.

Here Mrs. Boren explained the circumstances surrounding the making of

---

5. See cases collected in United States v. Quirk, D.C.E.D.Pa.1958, 167 F.Supp. 462, 464 at note 3.

6. See cases referred to in n. 5, supra.

7. Goldman v. United States, 1942, 316 U.S. 129, 135, 62 S.Ct. 993, 86 L.Ed. 1322; Monroe v. United States, 1956, 98 U.S. App.D.C. 228, 234 F.2d 49, 54; Zamloch v. United States, 9 Cir., 1952, 193 F. 2d 889.

the recording. She testified she had heard the recording played, and that it was a recording of the conversation in which she had participated.

■ It should first be said that nowhere has appellant complied with the provisions of Local Rule 18, subd. 2(f) of this Court, West's Ann.Cal.Code, requiring in the opening brief "page references to the record where the exhibits were identified, offered and received or rejected as evidence."

Not only is there no reference by table in the appendix to any exhibits received, but in the opening brief no reference is made by numbers to the "exhibits" referred to and objected to. Exhibit 32 was the only recording received in evidence. Appellant's reply brief refers to the lack of foundation as to that recording, and cites "page 22, line 17 to page 31" as containing "the discussion of the subject." The transcript from pages 21 to 31 discloses that appellee joins in one objection (Tr. 24), but the record discloses neither what the objection was, nor what it was to. In any event, the court reserved its ruling on such objection. Nowhere does it appear that any final ruling was made by the court or requested by either party.

We have laboriously gone through the record, and find on page 85 that Mrs. Boren described Exhibit 32 as "substantially" and "truly" reflecting the voices of the participants present at the conversation on September 28, 1954, and what they "then and there said." She likewise described the parties who were present on September 28, 1954, "within hearing distance of one another." (Tr. 152.) This testimony occurred on October 30, 1956, *several days after the recording had been played to the jury.* (Tr. p. 85, lines 3–9.) Up to that time in the trial four of the thirteen witnesses who testified at the trial but whose testimony was not written up for this appeal, apparently had already testified (Tr. 4). What their testimony was, with respect to the recording (if any there was), is unknown to us and does not appear in the record before us.

The minutes of the District Court Clerk disclose that on October 26, 1956 (Clerk's Tr. 15–17), the government's Exhibit 32 was played before the jury.[8] No reporter's transcript is before us with respect to what occurred on that day. We know from the minutes there were objections made by all defendants, ex-

8. "At 10:30 AM Court admonishes the jury *not to discuss this cause and excuses* the jury until 2 PM. In the absence of the jury, Court and counsel again confer re recordings and Court Orders that recordings now be played.

"Attorney Danielson moves that all witnesses be excluded from the courtroom during the playing of the recordings, and Court denies said motion.

"The tape recording Exhibit 32, dated Sept. 28, 1954, is played to the court in the courtroom in the absence of the jury.

"At 11:15 AM court recesses to 11:25 AM, at which time court reconvenes herein, and all being present as before, including all four defendants and counsel for both sides, the jury being absent, Court orders trial proceed, it having been stipulated that all counsel are present.

"Gov't Ex. 33, a spool wire recording, is played over the recording machine. Court and counsel confer re further playing of wire recordings, to wit, Exhibits 30, 31, and 34, and also confer re tape recording previously played, to wit, Ex. 32, and all defendants, except Def't Wal-

lace, join in objecting to playing of recordings before the jury.

"Court overrules said objections and Orders that said tape recording (Exhibit 32) be played before the jury.

" * * * (omissions)

"Gov't. Ex. 32 (tape recording) is admitted into evidence.

"At 3:10 PM court recesses to 3:15 PM, when court reconvenes herein, and all are present as before, and it is stipulated that the jury is present. Trial proceeds.

"Court orders that tape recording (Gov't Ex. 32) [be] played before the jury.

"Counsel approach the bench and Attorney Neeb moves the Court to permit the tape recording to be taken to the experts on sound recording to be tested as to whether or not it has been tampered with in any way.

"Court reserves ruling on said motion until further witnesses have been shown to make such examination necessary.

" * * * (omissions)"

Tr. of Clerk's Record, pp. 16–17.

cept defendant Wallace,[9] to the introduction into evidence of any recordings, and that all such objections were overruled. This Court has no way of knowing what specific objections were made nor the grounds therefor. We know the district court carefully heard all the recordings out of the presence of the jury, and admitted but one, declining to admit Exhibits 30, 31, 33 and 34. Ruling was reserved on the motion of one defense counsel to permit defendants to have the recordings examined by experts of their own choice. The motion apparently was not ruled upon nor renewed.

■■ The foundation which must be laid for the introduction of recordings of conversations—its nature and extent— differs widely. It is a matter largely within the good discretion, judicially exercised, of the trial judge. On the record now before us any interference with his exercise of that discretion would clearly be arbitrary. We can come to no conclusion that any action on his part was clearly erroneous. Fed.R.Crim.P. 52(a), 28 U.S.C.

As was said in Monroe v. United States, 1956, 98 U.S.App.D.C. 228, 234 F. 2d 49, at page 54:

> "Of course, there must be evidence introduced from which it can be inferred that the recordings are accurate. Lt. Thoman provided such evidence by testifying as to the operation of the recording device, his method of operating it, the accuracy of the recordings, and the identities of the persons speaking."

■ Mrs. Boren did that here. On the state of the record before us, we hold a sufficient foundation was laid.

IV—Insufficiency of the Evidence.

This was urged, but not presented in the briefs. We find no merit in this point.

The conviction is affirmed.

9. The defendant Wallace, heretofore not mentioned, was tried and acquitted at this same trial of an alleged similar con-

spiracy involving taxpayers other than the Borens.