**Theodosios Theodores TZANTARMAS, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 22798.**

United States Court of Appeals Ninth Circuit.

Oct. 17, 1968.

James P. Leahy (argued) Astoria, Or., for appellant.

Mallory C. Walker (argued) Asst. U. S. Atty., Sidney I. Lezak, U. S. Atty., Portland, Or., for appellee.

Before MADDEN, Judge of the United States Court of Claims, HAMLEY and MERRILL, Circuit Judges.

HAMLEY, Circuit Judge:

This appeal is taken from a conviction on a charge of knowingly and wilfully making false statements and representa-

tions in a matter within the jurisdiction of the United States Immigration and Naturalization Service (Service), in violation of 18 U.S.C. § 1001 (1964).

Arguing for reversal, defendant contends: (1) the court failed to rule on whether, under the circumstances of this case, defendant's "exculpatory no" answer to a question asked by an officer of the Service is a "statement" within the meaning of section 1001; (2) defendant's "exculpatory no" was not a "statement" within the meaning of that section; (3) defendant's negative answer was not material; and (4) certain exhibits were improperly admitted into evidence.

Defendant, a native born citizen of Greece, was a seaman aboard a Greek vessel which docked at Philadelphia, Pennsylvania, on January 30, 1964. According to defendant's testimony, his ship left port while he was on shore seeing a doctor. Stranded in Philadelphia, defendant took the bus to Portland, Oregon where, by prearrangement, he met Alice Paulson, a girl he had become friendly with on a previous visit. Defendant and Miss Paulson were married on February 7, 1964 in Vancouver, Washington.

On February 25, 1964, defendant voluntarily, and without appointment, appeared at the Portland office of the Service to inquire how he might legalize his status in this country. During the lengthy interview that followed, an investigator for the Service asked defendant, "Have you ever been married at any time previously?" Defendant replied, under oath, "No." The Government contends that this reply is a false statement and representation of the kind proscribed by section 1001.

After the interview, the Government instituted deportation proceedings against defendant. The show cause order charged that defendant was deportable under section 241(a) (2) of the Immigration and Nationality Act (Act), 66 Stat. 204, 8 U.S.C. § 1251(a) (2) (1964), because he had remained in the United States beyond the time permitted for an alien crewman. At the deportation hearing, held on February 27 before a Special Inquiry Officer, defendant admitted that he was deportable.

The Special Inquiry Officer then advised defendant that, although he was deportable, he could apply for the privilege of voluntary departure pursuant to section 244(e) of the Act, 66 Stat. 214 (1952), 8 U.S.C. § 1254(e) (1964). The officer explained to defendant that voluntary departure is a form of relief from deportation available to persons who have been of good moral character during the past five years and who are able to depart promptly and pay their own way.[1]

Defendant requested voluntary departure. In order to determine defendant's eligibility for this privilege, the officer conducted an inquiry into the relevant facts. One of the questions asked was, "Now, how many times have you been married?" Defendant answered, under oath, "Once, just now." He was then asked, "And your testimony is that you were not married in Greece?" Defendant replied, under oath, "Yes." The Government contends that the quoted answers are false statements and representations within the meaning of section 1001.

The day following the deportation hearing, defendant's wife of three weeks filed a petition in the Portland office of the Service, requesting modification of

---

1. While it was not explained to defendant, the privilege of voluntary departure may be an important benefit to one who is deportable and not eligible for other forms of relief. Voluntary departure avoids the stigma of deportation, enables the applicant to select his own destination, and, most importantly, facilitates the possibility of return to the United States. See 2 Gordon and Rosenfield, Immigration Law and Procedure, section 7.2a. In this case, defendant had to depart voluntarily in order to qualify himself for reentry into the United States as a non-quota immigrant upon the petition of his new wife and pursuant to section 101(a) (27) (A) of the Act, 66 Stat. 166 (1952), 8 U.S.C. § 1101 (a) (27) (A) (1964).

defendant's status so that he could receive a non-quota immigrant's visa. This petition was approved on April 13, 1964. In the meantime, defendant, having been granted the privilege of voluntary departure, had returned to Greece.

On June 8, 1964, defendant filed an application with the American Embassy in Athens, Greece, for an immigrant visa and alien registration. Solely because of his claimed marriage to Alice Paulson on February 7, 1964, defendant was granted a visa to return to the United States permanently as a non-quota alien. He was admitted in New York on June 22, 1964 and up to the time of the trial herein lived in Portland, Oregon.

It later came to the attention of the Service that at Thessalonika, Greece, on July 10, 1955, when defendant was nineteen years old, a marriage ceremony was performed between him and Theodora Mytelenois. Greek religious custom requires that a marriage between Greek citizens, in order to be valid in the eyes of the church and of the parties, be certified by the "Metropolitan" (bishop). This was not done with respect to defendant's 1955 marriage.

A daughter was born of this marriage in 1956, but in June, 1960, Theodora took the child and left defendant permanently. When the daughter entered school in Greece in 1962, the existence of the marriage was apparently questioned. For the sole purpose of permitting the daughter's enrollment, Theodora had the marriage "determined" (recognized).

Defendant initiated divorce proceedings against Theodora on September 24, 1962. The decree of divorce, however, was not entered at Thessalonika until June 1, 1964, which was nearly four months after defendant married Alice Paulson in Vancouver, Washington. During 1966, defendant's daughter born of Theodora was allowed to enter the United States in order to live with her father, his American wife and the two children born of their marriage.

In this criminal prosecution, instituted on December 27, 1967, defendant was charged with making false statements and representations on February 25 and 27, 1964. In proof of this charge the Government relied upon defendant's "No" answer at the February 25 interview, and his "Once, just now," and "Yes" answers at the February 27 deportation hearing, all as described above.

As stated above, defendant's first argument on this appeal is that the trial court erroneously failed to rule on whether defendant's "exculpatory no" answer, made during his questioning under oath on February 25, 1964, is a "statement" within the meaning of section 1001.

■ In our opinion the trial court did rule on this question. In its opinion filed in the case, the court held that the defendant falsely "stated" that he had never been married before; that the defendant knew the "statements" were false; and that defendant made the "statements" in an attempt to influence the Service's disposition of his case. The trial court must have been using the words "stated" and "statements" in contemplation of the statutory language, else the court's observations would have been irrelevant on the question of guilt.

But assuming that the trial court failed to make a ruling on this question of law, such a failure would not prejudice defendant if the ruling on that question must necessarily be adverse to defendant. This brings us to defendant's second point on this appeal.

■ In our opinion, defendant's "No" answer, made under oath on February 25, was, under the circumstances, a "statement" within the meaning of that part of section 1001, shown in italics below,[2] under which defendant was charged.

2. This statute reads:
"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, *or makes any false, fictitious or fraudulent statements or representations*, or makes or uses any false writing or document knowing the same to

It is true that there is a line of so-called "exculpatory no" cases in which the courts have read the terms "jurisdiction" or "statement" narrowly in order to avoid applying section 1001. These cases are collected in United States v. Adler, 2 Cir., 380 F.2d 917, 922.

As pointed out in *Adler,* however, the Ninth Circuit does not adhere to this view. See Brandow v. United States, 9 Cir., 268 F.2d 559.

Moreover, those decisions which do limit the application of section 1001 for the most part involve Government-initiated investigations in which the Government is acting as a "policeman." See Paternostro v. United States, 5 Cir., 311 F.2d 298, for a discussion of the relevant cases. In our case, on the other hand, the proceedings in which the false answers were given were civil in nature, and defendant was seeking the grant of a privilege. Whatever reasons there may be for giving section 1001 a narrow reading in the case of criminal investigations, those reasons are, in our view, inapplicable to the kind of proceedings here in question. As this court said in Ogden v. United States, 9 Cir., 303 F.2d 724, 742, where the accused made a false statement in a "certificate of non-affiliation," as part of an application for security clearance:

> "18 U.S.C.A. § 1001 was intended to serve the vital public purpose of protecting governmental functions from frustration and distortion through deceptive practices, and it must not be construed as if its object were narrow and technical."

Apart from what is said above, it should be noted that in advancing this particular contention, and indeed in all of his argument in this court, defendant directs his attention only to the "No" answer given on February 25. He also assumes that this "No" answer was charged to be only a "statement" within the meaning of section 1001. In fact, the charge also includes the "Once, just now," and "Yes" answers given during the voluntary departure inquiry on February 27, and as to the answers given on both days, the Government charges that they were "representations" as well as "statements" within the meaning of section 1001.

■ In our opinion, whether or not the "No" answer on February 25 was a "statement," it was at least a "representation" as to defendant's marital status at the time he married Alice Paulson. And if we are mistaken in believing that the false "No" answer on February 25 was violative of section 1001, we in any event conclude that the two false answers made on February 27 constituted violations of that statute.[3]

Defendant next argues that a false statement must be material in order to come within the ambit of section 1001, and he contends that his "No" answer given on February 25, 1964, was not material because no application for voluntary departure was then pending.

Defendant again overlooks the fact that he was charged with and convicted not only of making a false statement and representation on February 25, but of also making false statements and representations on February 27.

---

contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both." (Emphasis added.)

3. The opinion of the district court contains a finding that the defendant falsely stated that he had never been married before in sworn testimony taken before an Immigration Officer of the United States Immigration and Naturalization Service "on or about February 25, 1964, in Portland, Oregon." The opinion contains no express reference to the February 27, 1964 proceedings. However, the use of the word "on or about" and the references in the court's opinion to "statements" (there was only one statement of this kind on February 25), indicate to us that the court's finding extends to the statements defendant made on February 27, 1964. In any event, if the February 25 "No" was false, the February 27 "Once, just now," and "Yes," were also false. The February 27 statements were, if anything, more material than the February 25 statement, since an application for voluntary departure was then pending.

While the circuits are divided on the proposition, it is the rule of this circuit that materiality is an essential element of the crime of making false statements and representations as described in section 1001.[4] A statement is material if it could affect or influence the exercise of a governmental function. See *Brandow*, note 4, 268 F.2d at 565.

The privilege of voluntary departure is available only to those who can demonstrate good moral character during the five years preceding the application. Had defendant, on February 27, given truthful answers to the two inquiries referred to above, the question of whether he was a bigamist, and therefore not a person of good moral character, would have arisen. See Gonzalez-Martinez v. Landon, 9 Cir., 203 F.2d 196. It follows that the false answers he gave on that date were material because, to apply the test of *Brandow*, they could affect or influence the exercise of a governmental function.

We reach the same conclusion with regard to defendant's false "No" on February 25. On that day he voluntarily appeared at the Service's office in Portland, his purpose being to inquire how he might legalize his status in this country. For the same reasons stated above with respect to defendant's February 27 answers, defendant's false "No" on February 25 was crucial to a determination of whether the Government *could* grant any relief which would legalize his status in this country. Had defendant truthfully answered "Yes" on February 25, he would have been bound by that answer on February 27, and voluntary departure would in all likelihood have been denied.

We consider it immaterial that defendant may not have known, on February 25, that the only specific relief available to him was that of voluntary departure and that this required a showing of good moral character. He ap-parently did know, on February 25, that he was in the country unlawfully; he was interested in changing his status to a lawful one. He is thus chargeable with knowing that any question asked of him at that time might be material to the determination of whether his presence in the country could be legalized.

As his final argument on this appeal, defendant contends that certain documents should not have been received in evidence. We find no error in this regard.

Affirmed.

4. Dear Wing Jung v. United States, 9 Cir., 312 F.2d 73, 75; Poonian v. United States, 9 Cir., 294 F.2d 74, 75; Brandow v. United States, 9 Cir., 268 F.2d 559, 564–565.