**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sam John DEEP, Defendant-Appellant.**

**No. 72–1623.**

United States Court of Appeals,
Ninth Circuit.

May 10, 1974.

---

Alan Saltzman (argued), of Saltzman & Goldin, Ronald F. Merlino, Los Angeles, Cal., for defendant-appellant.

Lawrence W. Campbell, Asst. U. S. Atty., (argued), Eric A. Nobles, Elgin C. Edwards, Asst. U. S. Attys., William D. Keller, U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE and SNEED, Circuit Judges.

## OPINION

WALLACE, Circuit Judge:

Deep appeals his conviction of five counts of an indictment charging him with violations of the Selective Service Law and of a violation of 18 U.S.C. § 1001. The first, second, third and fifth counts, using different legal theories, essentially charged Deep with evading military service by knowingly making false representations to the Selective Service System that he was undergoing "active orthodontic treatment," when in fact he was not.[1]

---

1. Count one charged that Deep knowingly and wilfully secured military disqualification

because on January 26, 1971, he falsely represented to the Selective Service System

Count four charged that during the period from April 13, 1971, to May 11, 1971, Deep knowingly failed "to report to his Selective Service Local Board the fact that he no longer wore such appliances and was not undergoing active orthodontic treatment, a fact regarding defendant's physical condition that might result in his being placed in a different classification."

Deep moved to dismiss the indictment on several grounds, including failure of any of the counts to state an offense. The motion was denied. He also moved for judgment of acquittal at the conclusion of the government's case-in-chief and again at the conclusion of the evidence. Both motions were denied and a jury found Deep guilty on all counts. We affirm.

In count four, Deep was charged with a failure to report promptly to his local board any change in his physical condition which might result in his being reclassified. *See* 32 C.F.R. § 1625.1(b). Specifically the indictment alleged that, from April 13 to May 11, 1971, he failed to report that he no longer wore orthodontic appliances and was no longer undergoing active orthodontic treatment. Deep had appeared for his induction

physical examination in January, 1971, wearing orthodontic appliances. As a result, his local board classified him 1-Y (not currently qualified for service in the Armed Forces). Had the alleged unreported facts been true and had he reported them, the local board might have reclassified him 1-A (available for military service).

Viewing the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the facts are these: In October, 1970, subsequent to passing his preinduction physical examination and just prior to the date Deep was to report for induction, Dr. Bernard Bender, a dentist, examined Deep and ordered and installed for him orthodontic appliances. They consisted of eight bands and two arch wires. Four teeth in his upper jaw and four in his lower were banded; the arch wires were attached to and passed through loops in these bands. There were no small wires, which actually supply the tension to the appliances, available in Dr. Bender's office at that time. It is at least questionable whether they were ever installed. Deep returned for two addition-

"that he was then, and would be in the future undergoing active orthodontic treatment, when in fact he was not, and would not be in the future, undergoing such treatment."

Count two charged that on January 26, 1971, Deep "knowingly cause[d] to be made a false, improper and incorrect physical examination at the Armed Forces Examination and Entrance Station ["AFEES"], in that [he] reported for physical examination and induction wearing orthodontic appliances on his teeth and represented that he was undergoing active orthodontic treatment, and in consequence thereof was found not acceptable for induction, when in fact defendant was not then undergoing any genuine active orthodontic treatment, but had merely had orthodontic appliances placed on his teeth for the purpose of evading service in the Armed Forces . . . . "

Count three charged that on March 9, 1971, Deep knowingly caused to be made a "false, improper and incorrect classification of himself" by reporting to AFEES on Jan-

uary 26, 1971, wearing orthodontic appliances and "represented that he was then and would be in the future undergoing active orthodontic treatment, and was found not acceptable for induction on the basis that he was undergoing active orthodontic treatment, in consequence of which on March 9, 1971, the Local Board reclassified [him] from 1-A . . . to 1-Y, when in fact defendant was qualified for service in the Armed Forces and was not then undergoing any genuine active orthodontic treatment, but had merely had orthodontic appliances placed on his teeth for the purpose of evading service in the Armed Forces . . . . "

The fifth count charged that Deep knowingly "falsified, concealed and covered up a material fact and made a false, fictitious and fraudulent statement" in that he sent his board "a letter stating that he recently removed his orthodontic bands due to an automobile accident, when in fact he did not remove his orthodontic bands due to an automobile accident."

al recorded appointments; the last was on January 12, 1971.

On February 7, 1971, Deep was in an automobile accident and was hospitalized. X rays were taken to determine whether he had fractured his skull. At his trial, the government's expert orthodontist testified that the X rays showed that, as of the date of the accident and hospitalization, Deep was wearing only two of the eight bands and neither of the arch wires. He stated that these two bands alone could serve no possible orthodontic purpose.

On April 13, 1971, FBI agents interviewed Deep and asked him why he was no longer wearing his braces. Deep admitted that they also informed him that he was required to report his changed physical condition to his local board. His response to this advice was that he knew he was required to do so because he had read the back of his classification card, Form 110. (The local board had sent Deep classification cards on four different occasions.)

On May 13, Deep appeared before a federal grand jury. The assistant United States attorney in charge of the investigation noticed that Deep was not wearing his braces and informed Deep of that fact.

Finally, On May 14, 1971, Deep wrote his local board stating that he had been in an automobile accident and had to remove his bands as a result.

■ Count four of the indictment charged Deep with a knowing failure to perform a required duty during the period from April 13 to May 11, 1971. Clearly, there was sufficient evidence for the jury to believe that Deep's physical condition had changed in that at the time of the accident he was no longer wearing any type of effective braces; that this change might result in a reclassification; that Deep had a duty to report this change; and that Deep knew of this duty. His failure to do so during the period charged completes the proof necessary to sustain his conviction on count four.

United States v. Ayala, 465 F.2d 464 (9th Cir. 1972), is indistinguishable from the case before us. The four counts in *Ayala* appear to be the same as the first four counts in this case. There, too, there was a conflict in the evidence. In affirming count four, we held:

> These "conflicting stories . . . presented a question of fact to be passed upon by the jury at the time of trial, and by the trial judge on the motion for new trial." Bush v. United States, 9 Cir., 1959, 267 F.2d 483, 485, and cases there cited. The jury chose to believe the government's witnesses. If the jury believed that Ayala had removed his braces in early December, 1970, it could reasonably have inferred that at that time he was not receiving orthodontic treatment of any kind, and that he knowingly failed to inform his local board within the prescribed ten-day period that he was no longer receiving such treatment.

465 F.2d at 466.

It is true that there was evidence which the jury might believe that Deep had bad gums and a malocclusion. But that does not militate against the jury's obvious finding of the facts necessary for a conviction on count four. For this there was sufficient evidence. As in *Ayala,* the Deep jury could reasonably have inferred that Deep had removed his braces at some time between January 12 and February 7, 1971. (The only fact at issue is the exact date; Deep admitted that he himself took them off.) The jury could also reasonably have concluded that Deep was no longer undergoing orthodontic treatment of any kind.

We cannot distinguish *Ayala* based upon testimony of an expert called by the government who stated that bands *can* be removed for various periods as part of orthodontic treatment. He stated on direct examination that an orthodontist might remove them periodically

to clean or x-ray the teeth.[2] He also stated on cross-examination that, in a few hypothetical cases, the braces might be removed for two or three months to permit muscle exercises; however, those cases usually involve younger individuals in their formative years with a tongue-thrusting problem as a result of thumbsucking.[3]

The expert's testimony does not distinguish this case from *Ayala*. In order to hold otherwise, we would have to

---

2. The doctor stated:

> If the bands were left on too long, there is a very good possibility of decay and things like this happening underneath the bands. So even during full treatment that takes two years we like to take the bands off periodically to clean the patient's teeth, to take X-rays to make sure the teeth are in a healthy condition during orthodontic treatment.

3. The actual testimony in this regard was as follows:

> Q. Would it be reasonable to state that there are several orthodontic cases involving patients that bands and wires have been put on and then removed for a period of time, with a prescription of certain type of tongue and gum exercises, and then putting on that appliance again or some other type of appliance?
>
> In other words, this type of situation involving the removable and other types of active care, other than just adjustments and braces?
>
> A. Well, I think you're bringing up a hypothetical situation and I'm sure we could find one.
>
> You are talking about removing the braces and sending a patient to a speech therapist for tongue habits?
>
> Q. I'm talking about the method of active treatment used by orthodontists that involves certain tongue and jaw and muscle exercises that assist in the correction of malalignments.
>
> THE COURT: You mean after the taking of the braces off, the braces are taken off for the purpose of that exercise, is that what you mean?
>
> MR. SOMERS: For the purpose that when it is determined there is some problem with the braces and that they are not working right, using another type of active orthodontic treatment.
>
> THE WITNESS: Well, in most cases this type of muscle exercise you are talking about is used in conjunction with the braces.
>
> Many orthodontists employ the use of speech therapists and speech pathologists in their offices to work hand in hand with them during the active phase of treatment.
>
> I would imagine that there would be cases, like you have mentioned, where you could take the braces off and have the patient seek the help of this particular individual.
>
> BY MR. SOMERS:
>
> Q. So in several situations, or some situations at least, the part of active treatment is the removal of braces and going into some other type of care?
>
> A. Immediately.
>
> THE COURT: What did you say?
>
> THE WITNESS: Immediately. I wouldn't go for any length of time without any proper care.
>
> THE COURT: Well, what length of time normally, as an expert, would you say that braces would be on? I mean, if you can answer the question. If you can't, why, say so.
>
> How long would braces normally be on before you would conclude that that was not the proper approach and you would take the braces off for these muscle exercises, and so forth?
>
> How long would you leave them on there before you would make that conclusion?
>
> THE WITNESS: It is really very difficult to say, your Honor. I could think of a few hypothetical situations I have had in my case load, certain younger individuals who have what we call a tongue thrusting, a thumb sucking problem that causes anterior open bites. These are usually in the formative years that we can actually train the tongue, that we can train the muscles to help with our treatment. Generally speaking—
>
> BY MR. SOMERS:
>
> Q. Doctor, isn't this also—
>
> THE COURT: Wait a minute. Let him finish.
>
> You haven't answered by question yet. Maybe you can't.
>
> THE WITNESS: I really can't. It is really very difficult for me.
>
> THE COURT: Would it be a matter of two or three months?
>
> THE WITNESS: It could be.
>
> THE COURT: All right. Go ahead.
>
> BY MR. SOMERS:
>
> Q. Doctor, isn't it true that considerable amount of progress has been made with certain types of muscle therapy for certain types of problems in a short period of time, such as a couple of months?
>
> A. Well, you're right, there are certain cases that could be helped with some type of myo-therapy.

conclude that because of this testimony, the jury could not have reasonably drawn the inference, as was properly done in *Ayala,* that Deep was no longer undergoing *any* type of treatment, "active" or otherwise. We would have to say that, regardless of any other testimony, the jury was required to seize on a small part of the cross-examination of an expert, to give full weight to that testimony and to return an acquittal; and further, that the jury was required to find the following to be reasonable, acceptable and demonstrating a continuation of orthodontic treatment: (1) Deep, rather than an orthodontist removed his own braces in spite of expert testimony that the only way they can or should be taken off is by the orthodontist; and (2) he had removed his braces for some protracted period for orthodontically-prescribed muscular therapy (for which there was no evidence) which therapy is usually reserved for younger individuals with a prior history of thumbsucking (for which there was no evidence). We disagree that the jury was required to find such a hypothetical situation applied to this case. Not only does the law not require the jury to make such a finding, but it would be improper here because there was absolutely no evidence to support it. It is clear that the jury, as in *Ayala,* could and did properly conclude that Deep "was not receiving orthodontic treatment of any kind, and that he knowingly failed to inform his local board within the prescribed ten-day period that he was no longer receiving such treatment." *Ay-*

 *ala,* 465 F.2d at 466. We would err in reversing the jury's conclusion in this case since we are required to draw all inferences from conflicts in the evidence in favor of the government as the prevailing party. Glasser v. United States, 315 U.S. at 80.

Deep charges that count five does not state any offense and therefore his motion to dismiss should have been granted. The substance of the charge was that Deep made a material false statement in violation of 18 U.S.C. § 1001[4] when he wrote to his local board "stating that he recently removed his orthodontic bands due to an automobile accident, when in fact he did not remove his orthodontic bands due to an automobile accident." He contends that it is not material whether the removal was due to an accident or not, that that part of the statement would not influence any action or inaction by the board and, therefore, the statement is immaterial.

■ It is true that materiality must be demonstrated for a conviction pursuant to section 1001. Paritem Singh Poonian v. United States, 294 F.2d 74, 75 (9th Cir. 1961). The test for determining materiality is

> whether the falsification is calculated to induce action or reliance by an agency of the United States—is it one that could affect or influence the exercise of governmental functions,—does it have a natural tendency to influence or is it capable of influencing agency decision[.]

---

Q. Then in some of these cases they may involve the taking off of braces, is that correct, that have been put on?

A. Well, let me say that in most instances we do these things before we put the braces on.

Q. When you say "we" who are you referring to?

A. Orthodontists.

Q. Not necessarily dentists?

A. Not necessarily.

Q. Pardon?

A. Not necessarily.

Q. Continue, please.

A. I think I answered what you were asking me.

4. 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years or both.

United States v. East, 416 F.2d 351, 353 (9th Cir. 1969).

Although one could conjure up an argument how the isolated statement pertaining to the reason for removal was not material, taking the statement as a whole in the context in which it was made leads us to conclude that it was material. The statute provides for the punishment of any person who, in a matter within the jurisdiction of the government, "conceals or covers up by any trick, scheme, or device a material fact" or knowingly "makes any false . . . statements." Deep covered up the fact that he removed the bands and wires himself, not because of an automobile accident, but because the bands and wires were part of a scheme designed to prevent his induction into the service, that he had no other reason to wear them and that he removed them prior to the accident. His attempt to conceal and cover up the real facts by claiming that he removed the bands and wires due to an accident demonstrates the required materiality. If Deep had actually removed the bands and wires as part of an active orthodontic treatment, he would have had no reason to have concealed the fact that he had removed them prior to the accident. In addition, the suggestion that the bands and wires had been removed due to an accident would have a natural tendency to influence the local board to believe that the physical condition necessitating the initial orthodontic treatment still existed. We conclude that Deep both concealed a material fact and made a material falsification. The sufficiency of count five should be determined on the basis of a practical approach, not technical considerations. Hopper v. United States, 142 F.2d 181, 184–85 (9th Cir. 1943).

Because of concurrent sentences imposed, it is unnecessary for us to discuss counts one, two or three. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); United States v. Moore, 452 F.2d 576 (9th Cir. 1971).

Affirmed.

CHAMBERS, MERRILL, KOELSCH, BROWNING, DUNIWAY, WRIGHT, TRASK, CHOY, GOODWIN and SNEED, Circuit Judges, concur in this opinion.

HUFSTEDLER, Circuit Judge, with whom ELY, Circuit Judge, concurs, dissenting:

At the heart of my disagreement with the majority regarding count four is a differing view of the proof that is necessary to support a conviction under that count. The majority opinion states that "[c]ount four of the indictment charged Deep with a knowing failure to perform a required duty", and the opinion indicates that the breach of duty to which it refers was that Deep had failed to report that "he was no longer wearing any type of effective braces . . . ." The government could have charged Deep with knowingly failing to report that he had removed some part or parts of his dental appliances, but it did not do so. Rather the government charged that Deep had failed to report that he was no longer undergoing active orthodontic treatment. To prove the offense actually charged in count four, the government had to prove not only that Deep was not undergoing active orthodontic treatment from April 13, 1971, to May 11, 1971, but also that Deep knew that he was not undergoing such treatment.[1]

Even assuming arguendo that the jury could infer from the expert testimony that Deep had in fact ceased to undergo active orthodontic treatment, and giving the government's evidence its maximum force,[2] we cannot hold that a jury could

---

1. These were included as necessary elements of the offense in an instruction requested by the government and given by the district court. The government, as it must, acknowledges in its brief on appeal and its petition for rehearing that proof of these elements was necessary to sustain the conviction.

2. I ignore testimony favorable to Deep that was consistent with his efforts to receive continuing treatment because we must view

have found that Deep knew during the relevant period of time that he was not undergoing active orthodontic treatment. To conclude that the jury could not properly infer that Deep knew he had ceased active orthodontic treatment, we need not say that the jury was required to find that the removal of the braces by Deep was within the scope of active orthodontic treatment; we need only conclude that the jury could not find beyond a reasonable doubt that Deep knew that such was not the case.

The jury could not so find largely because active orthodontic treatment is a term of art the meaning of which is unclear even to experts. Although the government argued that the term is "clearly understood to any orthodontist or dentist, and any layman using common sense," the testimony of the government's expert witnesses about the meaning of the term indicates otherwise. None of the experts was able to define the term with any precision; none of the attempted definitions agreed with any of the others. If the expert witnesses could not agree upon any definition of active orthodontic treatment, how could the jury have attributed to Deep knowledge of what the terminology meant and knowledge that whatever it meant, he was not receiving that treatment?

In essence, only two facts are asserted that might support an inference that Deep was aware that he no longer was undergoing active orthodontic treatment; that appliances were removed

from his teeth and that they were removed by Deep.

First, the fact that part or parts of Deep's orthodontic apparatus had been removed was not, in light of the record sufficient to support an inference that he knew that he was not undergoing active orthodontic treatment. It is highly questionable whether or not it was proper on this record to conclude that Deep was in fact not undergoing such treatment,[3] and in reaching the conclusion that he was not, the jury had the guidance of several expert witnesses. Nothing in the record suggests that Deep was given comparable advice as to what constituted active orthodontic treatment. If a jury might be unable to infer even from expert testimony that Deep was not under active treatment, it surely cannot be said that beyond a reasonable doubt a lay person at the very beginning of orthodontic treatment would know that removal of a part or parts of his orthodontic appliances so impaired the quality of his treatment that it ceased to be active orthodontic treatment.

Second, from the testimony that bands are generally only properly removed by a dentist or orthodontist, the jury might reasonably have inferred that Deep, in removing his orthodontic appliances, was disobeying express or implied instructions from his dentist.[4] The inferential leap from the notion that Deep disobeyed his dentist to the conclusion that his active orthodontic treatment thereby was and was known to be terminated,

the record in the light most favorable to the government.

3. The record in Deep's case is clear that he *needed orthodontic treatment and that such* treatment had been commenced. One of the government's experts testified that removal of orthodontic bands for various periods of time up to two or three months was a part of some kinds of full orthodontic treatment and that removal for shorter times was a regular part of orthodontic treatment. While the majority opinion correctly maintains that the jury was not required to find that Deep's treatment was of this type, it seems improper to allow the jury to find be-

yond a reasonable doubt that it was not unless there was some evidence suggesting that it was not. There was no such evidence. These factors and their effect on what the jury could reasonably find with regard to Deep's knowledge about the status of his treatment distinguish this case from United States v. Ayala (9th Cir. 1972) 465 F.2d 464.

4. If, of course, Deep was not disobeying his dentist when he removed his bands, it would be even more obviously impermissible for the jury to infer that he knew that active orthodontic treatment had ceased.

however, cannot be made on this record. If a patient disobeyed his orthodontist's admonishment to avoid eating hard foods that might misalign the appliances, or failed regularly to wear auxiliary headgear, or, as in this case, removed wires or bands that were causing extreme discomfort, it could not be said that the patient knew that his active orthodontic treatment was necessarily terminated thereby. At most, it could be inferred that the patient knew that he might be impairing to some extent the effectiveness of the treatment.

Because the meaning of the phrase active orthodontic treatment is unclear and because there is insufficient evidence to show that, whatever the phrase means, Deep knew that he was not receiving such treatment, I conclude that Deep could not be convicted on this record of the offense charged in count four. Deep's motion for a judgment of acquittal should have been granted at the close of the government's case in chief.[5]

I concede, of course, that the evidence would support a conviction for failure to report the fact that orthodontic appliances had been removed from Deep's teeth. However, Deep was not charged with, nor was the jury instructed with regard to, that failure. The charge that Deep had knowingly failed to report that he was no longer undergoing active orthodontic treatment cannot be translated into a charge that he had knowingly failed to report that he had removed part or parts of his appliances. The government's failure of proof cannot be cured by deciding that the government fully proved a charge that it did not make.

I turn to the fifth count. The substance of the charge was that Deep made a material false statement in viola-tion of 18 U.S.C. § 1001 when he wrote to the board "stating that he recently removed his orthodontic bands due to an automobile accident, when in fact he did not remove his orthodontic bands due to an automobile accident." The charge did not state an offense. Materiality of the false statement is an essential element of an offense under section 1001 (United States v. East (9th Cir. 1969) 416 F.2d 351; Paritem Singh Poonian v. United States (9th Cir. 1961) 294 F.2d 74.) A statement is not material unless it would naturally affect or influence agency action or decision. Deep's statement that he had recently removed his orthodontic bands was material, but it was not false. The claimed falsity was in stating that the reason for the removal was an automobile accident. That statement, even if false, was not material because there is no decision or action of the local board that it could properly have affected or influenced.

In an effort to sustain its conclusion that a false statement of the reason for removing the braces was material, the majority argues that Deep intended thereby to mislead the board. The argument fails to establish materiality. A fact that is immaterial does not become material because a registrant has an evil motive in stating it. In determining materiality, the state of mind that is relevant is that of the board, not of the registrant. The majority further argues that the misrepresentation had "a natural tendency to influence the local board to believe that the physical condition necessitating the initial orthodontic treatment still existed." I am unable to discern any reasonable chain of inferences that could lead the board to believe that if Deep removed his bands for some reason other than an automobile accident, he did not need any

5. Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that "[t]he court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." As for the general standard for determining sufficiency of the evidence, see generally 8 J. Moore, Federal Practice ¶ 29.06 at 29–18 to 29–26.

orthodontic treatment. More importantly, with regard to both arguments, the majority cannot indicate what decision or action of the local board could have been affected or influenced by Deep's alleged falsification,[6] nor does the majority opinion supply any set of facts or logical inferences from which we could properly conclude that any such decision, action, or inaction was or could have been induced by Deep's statement of the reason for removing his braces. I am unable to supply any.

I would reverse.

6. The notification that Deep no longer had orthodontic appliances attached indicated a change in physical condition that would have required reevaluation of Deep's classification, and that, under the regulations, would doubtless have required termination of his disqualification for induction (he had ceased to be an "[individual] with orthodontic appliances attached . . . ."). Even if Deep may have desired the alleged misrepresentation to prevent reexamination of his classification, it could not have done so. The local board's actions were required to be the same, regardless of the reason for removal of the braces.