**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Darrell Daniel GOLDFINE, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Solomon Walter GOLDFINE, Defendant-Appellant.**

**Nos. 74–3397, 74–3320.**

United States Court of Appeals, Ninth Circuit.

June 1, 1976.

Murray B. Guterson (argued), Seattle, Wash., for defendant-appellant Solomon Walter Goldfine.

James S. Kempton (argued), Seattle, Wash., for defendant-appellant Darrell Daniel Goldfine.

J. Ronald Sim, Asst. U. S. Atty. (argued), Seattle, Wash., for plaintiff-appellee.

## OPINION

Before MERRILL and WRIGHT, Circuit Judges, and FERGUSON,[*] District Judge.

MERRILL, Circuit Judge:

Darrell Daniel Goldfine and Solomon Goldfine, brothers, are pharmacists licensed by the State of Washington. Darrell Goldfine was sole owner of a drugstore in Seattle, Service Rexall Drugs, and half owner of a second, Greenlake Rexall Drugs. Solomon Goldfine was an employee of his brother at Service Rexall. Darrell Goldfine was registered with the Federal Drug Enforcement Administration to sell controlled substances pursuant to 21 U.S.C. § 822. Solomon Goldfine was not so registered.

In 1974 an indictment was issued against the Goldfines, charging them with a multitude of violations of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* Following trial they were both found guilty of the following offenses in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841, 842, 843 and 846: conspiracy to possess controlled substances with intent to distribute, and to omit information from required records; possession with intent to distribute (two counts as to Solomon Goldfine; four counts as to Darrell Goldfine); knowingly failing to make and keep required records; and knowingly omitting material information from required records. In addition Darrell Goldfine was found guilty of use of interstate facilities in carrying on an unlawful activity in violation of 18 U.S.C. §§ 2, 1952(a)(3), and with making false statements to Compliance Investigators of the Drug Enforcement Administration, in violation of 18 U.S.C. § 1001. For the nine counts on which he was found guilty Darrell Goldfine received concurrent sentences of from one to five years. On each count he was fined $5,000 for a total fine of $45,000. For the five counts on which he

---

[*] Honorable Warren J. Ferguson, United States District Judge for the Central District of California, sitting by designation.

was found guilty Solomon Goldfine received concurrent sentences of one and three years. No fines were imposed. As to each defendant special parole terms were imposed.

At trial, the United States introduced evidence to the following effect: that both Goldfine pharmacies performed the usual and accepted functions of such establishments, but also were used for the acquisition of extraordinarily large quantities of controlled substances. In the course of their legitimate business activities all drugs were ordered from local suppliers, paid for by check, with records maintained as to acquisition and disposition. However, traffic in controlled substances was also carried on by orders from nine out-of-state firms, paid for by money orders purchased with cash, with no records kept showing the orders, receipt, or disposition. Drugs so acquired were sold to addicts in the Seattle area at exorbitant profits.

## Search

Prior to trial the Goldfines moved to suppress all evidence resulting from an audit of Service Rexall Drugs. The motion was denied and that order is assigned as error.

The audit was conducted pursuant to an administrative warrant issued by a United States magistrate under 21 U.S.C. § 880(b) and (d), relevant portions of which are set forth in the margin.[1] The warrant was issued upon a showing made by a Compliance Investigator, the substance of which is set forth in the margin.[2] The investigator did not disclose that activities of the Goldfines were under investigation, which, by then, included reports of large orders of controlled substances by the pharmacy, surveillance of the pharmacy, tracing of shipments and arrest of certain of the pharmacy's customers. Appellants contend that the audit was not an administrative inspection, but, in truth, was a search for evi-

1. 21 U.S.C. § 880(b):

"(1) For the purpose of inspecting, copying, and verifying the correctness of records, reports, or other documents required to be kept or made under this subchapter and otherwise facilitating the carrying out of his functions under this subchapter, the Attorney General is authorized, in accordance with this section, to enter controlled premises and to conduct administrative inspections thereof, and of the things specified in this section, relevant to those functions.

(2) Such entries and inspections shall be carried out through officers or employees (hereinafter referred to as 'inspectors') designated by the Attorney General. Any such inspector, upon stating his purpose and presenting to the owner, operator, or agent in charge of such premises (A) appropriate credentials and (B) a written notice of his inspection authority (which notice in the case of an inspection requiring, or in fact supported by, an administrative inspection warrant shall consist of such warrant), shall have the right to enter such premises and conduct such inspection at reasonable times."

21 U.S.C. § 880(d):

"(1) Any judge of the United States or of a State court of record, or any United States magistrate, may, within his territorial jurisdiction, and upon proper oath or affirmation showing probable cause, issue warrants for the purpose of conducting administrative inspections authorized by this subchapter or regulations thereunder, and seizures of property appropriate to such inspections. For the purposes of this section, the term 'probable cause' means a valid public interest in the effective enforcement of this subchapter or regulations thereunder sufficient to justify administrative inspections of the area, premises, building, or conveyance, or contents thereof, in the circumstances specified in the application for the warrant."

2. "1. The above establishment is a pharmacy registered by and with the federal government to obtain, deliver and possess controlled substances pursuant to federal regulations.

2. This establishment has not been previously inspected.

3. The proposed inspection is undertaken to determine whether the establishment is conducting its business in controlled substances in compliance with the statutes and regulations under which it is authorized to do business.

4. The inspection will be conducted within regular business hours and in a manner designated by Title 21 U.S.C. § 880 and Title 21 C.F.R., Part 316.

5. The inspection will extend to the establishment and all pertinent equipment, containers, and records, as specified in Title 21 U.S.C. § 880.

6. Samples will be collected when necessary to reasonable inspection and receipt will be given therefor.

7. A return will be made to the Court upon completion of the inspection."

dence of crime, and that a showing under traditional standards of probable cause to suppose that evidence of crime was present and seizable was necessary in order to support the warrant.

■ We agree with the Second Circuit in *Colonnade Catering Corp. v. United States,* 410 F.2d 197, 205 (2d Cir. 1969), *rev'd on other grounds,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), that "[a]cceptance of defendant's contentions would place the agent in the position of being authorized to conduct a warrantless search [or administrative inspection] only when he had no reason to suspect a possible violation." We reject the proposition that pharmacies as to which there is probable cause to suppose a violation are by that fact rendered exempt from administrative inspection and subject only to search for evidence of crime.[3] The administrative need for and the public interest in inspection continue to provide justification apart from the obtaining of evidence of crime.

■ If evidence of a crime is sought that would not be disclosed by an inspection under § 880(b)(1), limited to the purposes there specified, a search warrant specifying such evidence would be required and would have to be supported by a showing of probable cause to suppose the presence of that which was sought. However, if the extent of the intrusion is to be limited to an inspection under § 880(b)(1) an administrative inspection warrant upon probable cause as defined in § 880(d)(1) is all that is required.

■ The Goldfines contend that the showing made for issuance of warrant does not constitute probable cause. In our view paragraphs 1, 2 and 3 (see note 2, *supra*), showed justification for inspection under the statutory definition. In drafting that

definition Congress apparently had in mind the language of *Camara v. Municipal Court,* 387 U.S. 523, 539, 87 S.Ct. 1727, 1736 (1967): "If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *See* H.R.Rep. No. 91–1444, 91st Cong., 2d Sess., 1970 U.S.Code Cong. & Admin.News, p. 4623. A valid public interest in the inspection clearly appears.

We conclude that the inspection was proper and that it was not error to deny the motion to suppress.

### The Conviction Under § 841

■ The Goldfines were prosecuted under 21 U.S.C. § 841(a)(1), which makes it unlawful for "any person" knowingly or intentionally to possess with intent to distribute a controlled substance except as authorized by the Act. Darrell Goldfine contends that by virtue of his status as a registrant he could only be prosecuted under §§ 842 and 843, which provide lesser penalties for certain specific violations by registrants. Section 841, he contends, should be limited to those outside the legitimate distribution chain. Solomon Goldfine makes a similar contention. He asserts that as an employee of a registrant he is exempt from registration under § 822(c)(1) and is authorized to possess controlled substances and thus should be free from prosecution under § 841.

Our court has rejected a similar contention made by a medical doctor in *United States v. Rosenberg,* 515 F.2d 190 (9th Cir. 1975), and the case on which the Goldfines rely has now been reversed by the Supreme Court. *United States v. Moore,* 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975). There it was held:

---

**3.** *See United States v. Blanchard,* 495 F.2d 1329, 1330–31 (1st Cir. 1974). In that case the application for the warrant asserted in part that, from an agent's personal examination, it appeared that defendant's tavern was serving liquor in violation of law. This assertion, instead of rendering the search subject to the "traditional" Fourth Amendment standards, was deemed sufficient in itself to satisfy the standards for administrative warrants set forth

in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Other courts have upheld administrative warrants, issued under § 880, which were founded on allegations of suspicious activities on the part of the defendants. *United States v. Montrom,* 345 F.Supp. 1337, 1342 (E.D.Pa.1972), *aff'd mem.,* 480 F.2d 918, 919 (3d Cir. 1973); *United States v. Greenberg,* 334 F.Supp. 364, 367 (W.D.Pa. 1971).

"By its terms § 841 reaches 'any person.' It does not exempt (as it could have) 'all registrants' or 'all persons registered under this Act.'"

423 U.S. at 131, 96 S.Ct. at 340.[4]

### Convictions for Violations of Record Keeping Requirements

■ Darrell Goldfine was charged with omitting material information from required records in violation of § 843(a)(4). Specifically he was charged with failing to maintain and furnish records respecting out-of-state purchases. He asserts that failing to maintain any records at all is not a furnishing of false information. We find no merit in this contention. He furnished records respecting some purchases (in-state), but omitted information respecting others (out-of-state). This omission constituted a violation of the section. To willfully furnish incomplete records with the implicit representation that they are complete is to furnish false information.

■ Solomon Goldfine contends that since he was not a registrant, record-keeping requirements did not apply to him; that his only offense was in selling prescription drugs without a prescription in violation of §§ 842(a) and 829. He was charged with violating § 843(a)(4) by omitting material information from records required to be made and kept, and with violating § 842(a)(5) which makes it unlawful "to refuse or fail to make, keep or furnish any record * * * order or order form * * required under this subchapter." Section 828(a) makes it unlawful for "any person" to distribute a controlled substance save pursuant to written order of the distributee. Section 828(c)(1) requires that preservation of such orders for a period of two years and that they be made available for inspection. These requirements applied to Solomon Goldfine.

### False Statement

18 U.S.C. § 1001, in relevant part, imposes criminal penalties on one who knowingly and willfully makes any false, fictitious or fraudulent statements or representations in "any matter within the jurisdiction of any department or agency of the United States."

In the course of the investigation of this case, Darrell Goldfine, after having received *Miranda* warnings, was asked by Compliance Investigators of the Drug Enforcement Administration whether he had made any out-of-state purchases. The investigators already knew that he had. He stated that he had not. For that false statement he was charged with a violation of § 1001.

■ There is no dispute but that the statements were made to agents of the Drug Enforcement Administration in a matter within the jurisdiction of that agency. Darrell Goldfine contends, however, that since the Compliance Investigators knew the answer and were not misled by the falsity, the statement was not materially false. The critical question respecting materiality is posed in *Brandow v. United States,* 268 F.2d 559, 565 (9th Cir. 1959), as: "[C]ould the false statements have affected or influenced the exercise of a governmental function?" The court, at 565, adopted with approval the following language from *United States v. Quirk,* 167 F.Supp. 462, 464 (E.D.Pa.1958), *aff'd* 266 F.2d 26 (3d Cir. 1959):

"[W]e believe that the conduct Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible. We think the test is the intrinsic capabilities of the false statement itself, rather than

---

4. The Court also rejected the contention that Congress established two separate and distinct penalty systems, with § 841 applying only to those not registered under the Act, and §§ 842, 843 applying to registrants. It stated that there was "no real support for the proposition that

Congress intended to establish two mutually exclusive systems," 423 U.S. at 133, 96 S.Ct. at 341; on the contrary, "Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant." 423 U.S. at 134, 96 S.Ct. at 342.

the possibility of the actual attainment of its end as measured by collateral circumstances."

Under such tests the statement here was clearly material.

■ Relying on *United States v. Bedore,* 455 F.2d 1109 (9th Cir. 1972), Goldfine contends that the statement here was not the kind of statement that the statute was intended·to reach.

The statement here was made by a registrant in the course of an inspection conducted by the regulatory agency charged with the duty of investigating the manner in which he was complying with the requirements imposed upon him by law. This is far different from the sort of statement discussed in *Bedore* which the court there noted was "unrelated to any claim of the declarant to a privilege from the United States * * *." 455 F.2d at 1111.

■ Goldfine contends that the statement should fall within the "exculpatory-no" exception recognized by some courts, *e. g., Paternostro v. United States,* 311 F.2d 298 (5th Cir. 1972); *United States v. Chevoor,* 526 F.2d 178 (1st Cir. 1975); *United States v. Bush,* 503 F.2d 813 (5th Cir. 1974). In *Brandow v. United States, supra,* this court refused to give recognition to this exception in a case where the exculpatory denial was given to agents of a regulatory agency conducting a criminal investigation legitimately within its purview. This holding has been followed in *United States v. Ratner,* 464 F.2d 101, 102–5 (9th Cir. 1972). See also: *Cooper v. United States,* 282 F.2d 527 (9th Cir. 1960).

We conclude that the conviction of Darrell Goldfine of violation of 18 U.S.C. § 1001 was not erroneous.

### Use of Interstate Facilities

■ Darrell Goldfine was convicted of violating 18 U.S.C. § 1952(a)(3), which makes it unlawful to use a facility of inter-state commerce with the intent to promote or carry on an unlawful activity. While appellant concedes that the mails were used to order and receive controlled substances from out-of-state firms, he contends that 21 U.S.C. § 843(b), as the more specific statute applies here. This contention is without merit. Section 1952 was specifically amended by the Controlled Substances Act to include activities involving controlled substances within its proscription. As such the Government was free to choose to prosecute Goldfine under either of the applicable statutes. *United States v. Brown,* 482 F.2d 1359 (9th Cir. 1973).

In both cases, judgment is affirmed.

FERGUSON, District Judge (concurring and dissenting):

I concur with the majority's opinion with the exception of its treatment of the 18 U.S.C. § 1001 issue. From that I respectfully dissent.

It is critical to observe at the outset that the majority reaffirms the continuing validity of *United States v. Bedore,* 455 F.2d 1109 (9th Cir. 1972) by attempting to distinguish it. *Bedore,* as the Ninth Circuit observed in *United States v. Ratner,* 464 F.2d 101, 105 (1972), is an " 'exculpatory no'—policeman case," meaning, that under the principles of *Bedore,* § 1001 typically does not apply where an accused falsely denies his guilt to the police.[1] Thus, in the routine case, if an agent of the F.B.I. questions a suspect and the suspect falsely denies guilt, the suspect cannot be properly charged under § 1001. That section does not usher a heads we win—tails you lose philosophy into the criminal justice system. ("If you tell our version of the truth, we will call it an admission and use it against you on the substantive offense; If you tell us something which materially varies from our version of the truth, we will charge you with a § 1001 felony").[2] *Bedore* stands for the

1. In *Bedore,* the defendant made a false statement of identity to an F.B.I. agent attempting to serve a subpoena. Its protections thus extend to individuals who have not been accused as well.

2. The coin fortunately is three sided. The accused can say nothing or plead the fifth amendment and that action cannot be used against him in a federal proceeding. *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99

proposition that an accused may plead not guilty, in or out of court, without fear of additional criminal sanctions.

Without specific reference to the facts, the majority purports to distinguish *Bedore* on the ground that here the defendant's statement "related" to a claim of the declarant to a privilege from the United States. I cannot agree with the assumption that Congress intended § 1001 to apply to confrontations between police officer and citizen in circumstances where the false statement fortuitously bears an attenuated relationship to a claim of privilege. The facts clearly indicate that the statement was not made in pursuit of a privilege and that the agents were pursuing a criminal investigation of anyone and everyone involved in a drug ring, independent of whether or not the participants happened to claim a privilege from the United States.

1. In July, 1973, the Seattle office of the D.E.A. became aware that extraordinary amounts of controlled substances were being ordered at the Goldfine drug stores.

2. In August, a D.E.A. agent in Seattle contacted the D.E.A. office in Minneapolis and asked its help in setting up a trace of a shipment of controlled substances to Seattle from Minneapolis.

3. From October 4 to October 25, D.E.A. agents occupied an apartment across the street from the defendants' Service Rexall Drugs store and kept it under surveillance.

4. On October 16 and October 19, two separate shipments from Minneapolis to Seattle were mailed under the control of Minneapolis D.E.A. agents. These orders were observed by investigators to be delivered by United Parcel Service on October 24 to the Seattle drug store.

5. On October 24, Seattle police joined with D.E.A. agents in surveilling the customers of the Service Rexall Drugs store.

6. Two customers were arrested; controlled substances were found on their persons; the drug store records did not reflect sales to them.

7. On October 25, pursuant to the authority of a warrant issued by a United States magistrate, D.E.A. compliance investigators commenced what they termed "an accountability audit."

8. Darrell Goldfine was given *Miranda* warnings. When asked whether he made any out-of-state purchases, he stated that he had not. To put it another way, he pled not guilty to a serious set of criminal charges.[3]

Clearly the agents in the case were not present as tax collectors, privilege conferrers, or regulators—they were policemen. And just as clearly, Darrell Goldfine responded as an accused, not as a person seeking a privilege from the government. To be sure, the answer related superficially to the administrative concerns of the agency, but when Drug Enforcement Agents are obviously in the midst of a criminal investigation, it is unfair to characterize them as administrators and unrealistic to characterize the defendant as a privilege seeker. The "administrators" were police, and the "privilege-seeker" was a suspect refusing to admit guilt.

But the majority appears to be saying more than that *Bedore* shall be distinguished in circumstances where the statement "relates" to a claim of privilege—however insubstantial that relationship may be.

(1975); *Scarborough v. Arizona*, 531 F.2d 959 at 961 (9th Cir., 1976). Nonetheless any appreciation of the communicative realities must lead to the recognition that standing mute in the face of questions is an exceedingly unnatural response and that "taking the fifth" has been so often accompanied by social ostracism that it is an unwholesome option. Americans traditionally have assumed that without fear of sanctions they could deny guilt and wait for the government to prove otherwise. If the majority is correct, some of those Americans are mistaken.

3. Moreover it is instructive to recognize that the defendant claimed no privilege to possess or sell the contraband involved. He denied that he had made any out-of-state purchases.

In the paragraph following its disposal of *Bedore,* the majority proceeds in dictum to consider the exculpatory-no doctrine treating it as if it were an argument entirely separate from the defendant's reliance on *Bedore.* There the majority states that the exculpatory-no doctrine does not apply to exculpatory denials "given to agents of a regulatory agency conducting a criminal investigation legitimately within its purview." Apparently the majority is suggesting that false exculpatory denials made to Drug Enforcement Agents violate § 1001 whether or not they significantly relate to a claim of privilege and, therefore, whether or not they significantly relate to the regulatory functions of the agency. Thus, under the majority's analysis, false denials of crime made to an F.B.I. agent are not covered by § 1001 unless they bear some unspecified degree of relationship to a claim of privilege from the United States or to a claim against the United States. False denials of crime made to D.E.A. agents within the jurisdiction of the agency are covered by § 1001 whether or not the regulatory functions of the agency are substantially involved.

The majority does not even attempt to support its view with references to the legislative history. Instead it supposes that this awkward scheme is required by the prior law of this circuit. The majority position, however, finds no support in the language of the statute, its legislative history, or prior precedent.

As is recounted in *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1940), the relevant language of 18 U.S.C. § 1001 was supplied by an act of Congress in 1934 amending § 35 of the Criminal Code.[4] Prior to that amendment, the statute imposed criminal penalties against anyone who

*for the purpose of obtaining or aiding to obtain the payment or approval of [a*

*claim against the government], or for the purpose and with the intent of cheating and swindling or defrauding the Government* of the United States, or any department thereof . . . shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations . . .. 40 Stat. 1015 (1918) (emphasis added).

The 1934 amendment in substance retained the knowledge and willfulness requirements but removed the "purpose" requirement. Thus the relevant provision imposed criminal sanctions against anyone who

shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations . . . in any matter within the jurisdiction of any department or agency of the United States . . . .. 48 Stat. 996.

*Bedore* recognized that this amendment could only be understood in light of the legislative history, for if one merely looked at the words themselves, one would have to suppose that

virtually any false statement, sworn or unsworn, written or oral, made to a Government employee could be penalized as a felony. Thus read, section 1001 would swallow up perjury statutes and a plethora of other federal statutes proscribing the making of false representations in respect of specific agencies and activities of Government. Extension of section 1001 to its literal breadth, however, cannot be justified by its legislative history. 455 F.2d at 1110.

The focus of the congressional concern is clearly evidenced in the report of the Senate Committee on the Judiciary.[5] S.Rep. No. 1202, 73d Cong. 2d Sess. (1934). There

4. The statute was codified in its present form in 1948. The 1948 changes were purely cosmetic except that the maximum term of imprisonment under the section was reduced from ten years to five years. 62 Stat. 749.

5. The amendment was added in the Senate after the House had reported the bill. The House Report, therefore, does not speak to the issue. H.Rep. No. 1463, 73d Cong. 2d Sess. (1934).

the Committee authors indicated that the amendment's purpose was to reach

> a large number of cases involving the shipment of "hot" oil, where false papers are presented in connection therewith, and also those cases within the Public Works Administration where contractors are performing work payable from the Public Works appropriation and false certificates are made as to the actual wages paid. *Id.* at 1.

The purpose of the amendment was explained to the Senate in similar terms.[6] Senator King in the course of a brief explanation of the bill maintained that:

> There is nothing which permits us to make an investigation and prosecute persons who are engaged in the "kick-back" practice. They make false returns, claiming that they paid certain amounts to their employees, when they have not done so. This bill just amends the law so as to give the Federal Government authority to deal with that class of cases.[7]  78 Cong.Rec. 11270 (1934).

Although there was no discussion in the committee reports or in the debates on the floor of Congress as to why the provisions of the bill extended to "any matter within the jurisdiction of any department or agency of the United States . . . ." there is a firm basis for discerning the reason for inclusion of the language. Earlier in the same session of Congress, a bill had been passed to curb the same abuses. That bill, which contained the "any matter" language, was vetoed by President Roosevelt because a portion of it duplicated then existing legislation (in § 35 of the Criminal Code) which carried higher (the President thought more appropriate) penalties. 78 Cong.Rec. 6778–79 (1934). Congress, therefore, borrowed the "any matter" language from the earlier bill and made its amendment part of § 35 so that the President would be satisfied with the level of sanctions.

Given the absence of any later contrary discussion, therefore, the best evidence of congressional intent with respect to the "any matter" language can be found by referring to the Report of the House Committee on the Judiciary, the committee which authored the language. H.R.Rep. No. 829, 73d Cong.2d Sess. (1934). That committee had been concerned with the same abuses. It had heard testimony from Louis R. Glavis, Director of Investigations of the Department of the Interior, who complained of the difficulty of prosecuting cases involving

> collusive bidding, false statements relative to the financial condition of a community or political entity, misrepresentation relative to the production or disposition of crude petroleum or the products thereof, making of false affidavits relative to public land matters in which the oath is required by rules and regulations rather than by act of Congress. *Id.* at 1–2.

Thus the Secretary of the Interior "transmitted a draft of a bill to penalize *such acts* with reference to matters within the jurisdiction of the Secretary of the Interior, Administrator of Public Works, and Administrator of the Code of Fair Competition for the Petroleum Industry . . . ." *Id.* at 2 (emphasis added). Instead of confining the bill to those agencies, the "committee was of the opinion that the proposed legislation should be broadened to punish *such acts* committed before any department or agency of the Government, as, for example, the Reconstruction Finance Corporation. It therefore rewrote the bill to meet that object." *Id.* at 2 (emphasis added).

Since a literal interpretation of 18 U.S.C. § 1001 is obviously foreclosed, and since Senate Report 1202 read in conjunction with House Report 829 makes it clear that the section is designed to combat certain types of abuses, it is appropriate to discuss the abuses which prompted the legislation.

---

6. The Senate amendments were passed on the House side without discussion. 78 Cong.Rec. 11513 (1934).

7. Another portion of the bill dealt with the destruction of government property. The destruction of government property was also a part of the "class of cases" referred to by Senator King.

The Congress was not merely attempting to protect the federal treasury. The concern with the false claims to the Public Works Administration was a reaction to that need, but the concern over "hot oil" was unrelated to pecuniary loss to the government. *United States v. Gilliland, supra.* The National Industrial Recovery Act purported to confer power upon the executive branch to prohibit the transportation of oil or petroleum in excess of amounts proscribed by state law or federal regulations. 48 Stat. 195 (1933). The Secretary of the Interior, pursuant to authorizing legislation, in an effort to assure compliance with the Act, issued regulations requiring every producer of petroleum to file monthly statements detailing *inter alia* the quantities of petroleum shipped.[8] Congress wanted to insure that criminal sanctions would accompany the filing of intentionally false reports.

The congressional desire to prevent and/or punish the filing of statements designed to frustrate a regulatory scheme is understandable. Federal functions cannot be easily effectuated if individuals without fear of criminal sanction can file false claims, support applications for privileges with false statements, or deliberately mislead regulators with intentionally misleading submissions. But nothing in the legislative history supports the hypothesis that government prosecutors are entitled to tack on an 18 U.S.C. § 1001 violation (with its attendant provisions for five years in prison and/or $10,000 in fines) every time an accused falsely denies guilt. Although federal regulatory schemes cannot adequately

function if deterrents to the providing of false information are not provided, it is a fundamental premise of our criminal justice system that the detection of crimes does not depend on assuring that the accused individuals be forced to tell the truth to law enforcement agents. As the Supreme Court observed in *Escobedo v. Illinois,* 378 U.S. 478, 488–89, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964):

> We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the "confession" will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation.

This is not to imply that the privilege against self-incrimination or the right to counsel is violated by the majority's ruling.[9] It is to say that there is no basis for the majority's assumption that Congress, in enacting the false statements statute, intended to proscribe the false denial of guilt to police agents in those circumstances when the criminal investigation can be conceptually related to regulatory functions of the government. There is no evidence that Congress intended even partially to revolutionize our criminal justice system. If it had, the measure would surely have been subjected to serious, impassioned, and prolonged debate. Instead the legislative history is that which one would expect to accompany a non-controversial bill designed to punish those who would seek to frustrate a regulatory scheme, unfairly acquire a

---

**8.** As the Supreme Court ruled in *United States v. Gilliland, supra,* 312 U.S. 86, at 95, 61 S.Ct. 518, it is of no moment for purposes of interpreting the false statements statute that "principles of constitutional government" prevailing in 1935 caused the Supreme Court to invalidate these regulations. *Panama Refining Co. v. Ryan,* 293 U.S. 388, 433, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

**9.** The *Miranda* warnings provide adequate safeguards for the protection of fifth and sixth amendment rights. *Miranda* warnings provided adequate notice to this defendant that false statements by him could be used against him on the substantive offense, but it is by no

means clear that they provided fair notice that such statements could also constitute an independent felony violation.

The question of whether or not the *Miranda* warnings provided fair notice to the defendant, however, has little bearing on the question of whether or not the Congress intended the defendant's statements to be covered by the statute in question. The question of whether or not the defendant has been told that a future course of conduct would be subject to criminal penalties is quite different from the question of whether or not that conduct is in fact subject to criminal penalties.

privilege, or pirate the federal treasury. The majority's ruling simply discards congressional intent and creates a criminal law never passed by the Congress.

Neither the prior decisions of the Supreme Court nor of this circuit require acceptance of the majority's reading of § 1001. The Supreme Court has yet to face the question of whether exculpatory statements to policemen are embraced by § 1001. *See, e. g., Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); *United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. Beacon Brass Co.,* 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61 (1952); *United States v. Gilliland, supra.* In fact, in *Bryson* the Court specifically left open the question of whether any statements to the F.B.I. can fall within the scope of the statute. 396 U.S. 64, at 71 n.10, 90 S.Ct. 355, *citing Friedman v. United States,* 374 F.2d 363 (8th Cir. 1967) (§ 1001 does not apply to the making of false statements to the F.B.I. in an effort to initiate a federal prosecution).[10]

The Ninth Circuit has given limited acceptance to the exculpatory-no exception. In *Brandow v. United States,* 268 F.2d 559 (1959) the court refused to apply that exception to an internal revenue investigation and in dictum indicated its disapproval of these cases which had applied it to F.B.I. investigations. *Id.* at 564, *disapproving United States v. Levin,* 133 F.Supp. 88 (D. Colo. 1953); *United States v. Stark,* 131 F.Supp. 190 (D. Md. 1955). *Bedore,* however, held contrary to the *Brandow* dictum (at least with respect to oral unsworn statements (455 F.2d at 1110 n.1)) and applied the exculpatory-no doctrine to a false statement made to an F.B.I. agent. Thus this circuit in *Ratner* did not find *Bedore* controlling in yet another internal revenue case because of the "several previous Ninth Circuit cases holding answers to Internal Revenue Service investigations to be outside the

'exculpatory-"no"-police-officer' holdings." 464 F.2d at 105.

These holdings of the circuit (although open to serious question (*see United States v. Bush,* 503 F.2d 813 (5th Cir. 1974); *Paternostro v. United States,* 311 F.2d 298 (5th Cir. 1962)) at least can be reconciled with *Bedore* on a principled basis. Materially false statements made to internal revenue agents are given for the purpose of depriving the government of revenue to which it is entitled. *Cooper v. United States,* 282 F.2d 527, 530 (9th Cir. 1960). Thus even when false statements to treasury agents come within the context of a criminal investigation, they substantially implicate the concerns which led to the passage of § 1001. On the other hand false denials of guilt to F.B.I. agents obviously do not implicate the concerns which led to the passage of § 1001. So understood, *Brandow* and *Bedore* are in a state of uneasy reconciliation. The majority dictum, however, stretches the internal revenue cases to support the broad proposition that false exculpatory denials made to any agency with regulatory functions are automatically covered by the section whether or not regulatory functions are involved. Unlike the internal revenue cases, this extension cannot be harmonized with the legislative history or with *Bedore.* Moreover, Darrell Goldfine's denial of guilt in this case in no wise can be said to substantially involve the concerns of the section. The question of his continued status as a registrant was wholly peripheral to the criminal investigation. The attenuated factual relationship of his statement to a claim of privilege is a frail reed upon which to base this felony conviction.

Nor should it be thought that the majority's rewriting of § 1001 is in any way necessary to protect our citizenry from the serious problems presented by illegal traffic in narcotics. Congress has passed a series of statutes designed to control drug trafficking. Pursuant to these statutes, the

---

10. In *Bedore,* this circuit indicated by way of dictum that it was unwilling to go as far as the *Friedman* court. The *Bedore* court stated that false reports of crime are "[t]ypical of the kinds of statements that are within the purview of

section 1001." 455 F.2d at 1111. The *Bedore* conclusion is consistent with the legislative history which indicates that the legislature intended to combat certain types of abuses independent of the agency affected.

government has secured nine felony convictions against Darrell Goldfine—only one of which is questioned in this dissent. There is no evidence that the government's attack on drug crime will be thwarted if prosecutors cannot charge § 1001 violations against individuals who falsely deny criminal charges to criminal investigators. If the federal criminal code needs further amendments to combat drug crimes, then Congress should pass a statute. But § 1001 is torn from its context when it is applied here. Darrell Goldfine's denial of guilt in this case in no wise can be said to substantially involve the concerns of the section.

But even if the concerns of the section were properly deemed to be implicated, I could not and cannot agree that the statement given by the defendant was a *materially* false statement. In *United States v. Cole,* 469 F.2d 640, 641 (9th Cir. 1972), *quoting Robles v. United States,* 279 F.2d 401, 404 (9th Cir. 1960), the Ninth Circuit stated the test of materiality as follows:

> [T]he test is . . . "whether the false statement has a natural tendency to influence, or was capable of influencing the decision of the tribunal making the determination required to be made."

Thus the materiality requirement refers to the state of mind of the audience, not the state of mind of the speaker. *See United States v. Deep,* 497 F.2d 1316, 1324 (9 Cir. 1974) (Hufstedler & Ely, JJ., dissenting). As the majority recognizes, the agents in this case could not possibly have been influenced by the defendant's denial of criminal conduct. The agents knew that the defendant had made out of state purchases. His denial, then, had no material tendency to influence. The statement simply does not meet the test of materiality stated in *Cole* and *Robles.* Instead the majority relies on the test applied in *Brandow v. United States, supra,* 268 F.2d at 565, *quoting United States v. Quirk,* 167 F.Supp. 462, 464 (E.D. Pa. 1958), *aff'd,* 266 F.2d 26 (3d Cir. 1959):

> "We think the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attain-

ment of its end as measured by collateral circumstances."

This test was adopted on the ground that what " 'Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible.' " *Id.* This purported reliance on congressional intent was not accompanied by a single reference to the legislative history.

Surely there is nothing in the legislative history that supports this hypothesis. The legislative history, detailed *supra,* reveals an unmistakable purpose to protect the government. There is not a line in the legislative history that indicates Congress intended to root out sin independent of its capacity to injure government. Indeed the assumption runs contrary to the underlying purposes of criminal law. As one commentator has cogently observed:

> All would agree that the criminal law seeks to prevent harmful results rather than to punish evil intent that produces no harm. Justice Holmes suggested that "the aim of the law is not to punish sins, but to prevent certain external results." LaFave and Scott similarly claim that "[t]he broad purposes of the criminal law are, of course, to make people do what society regards as desirable and to prevent them from doing what society consider to be undesirable." If the criminal law is extended to punish bad intent alone or the mere possibility of harmful conduct, it goes beyond its accepted role, appears unfair and overreaching, and ultimately loses its credibility and integrity. Robinson, A Theory of Justification: Societal Harm as a Prerequisite for Criminal Liability, 23 U.C.L.A. L.Rev. 266 (1975).

Here federal agents already aware of multiple felony drug violations set the defendant up for a false statement violation. They had a right to ask the question, but a system of law which attaches criminal liability to an answer which can cause no harm is unfair, overreaching, low in credi-

bility, and unworthy of respect.[11] A congressional intent to enact such a system should not be lightly assumed. I would follow the *Cole* statement of the test, rather than the *Brandow* version. The § 1001 conviction should be reversed.

Eugene A. WRIGHT, Circuit Judge (specially concurring):

I concur but add a few words on the subject of Darrell Goldfine's conviction under Section 1001. It was proper because: (a) despite the anticipation of criminal prosecution the DEA agents were conducting a legitimate administrative investigation at the time they asked the question generating Goldfine's false reply; and (b) the false statement was clearly "material" under *Brandow*.

By the plain words of § 1001 Goldfine's conduct was proscribed and the conviction proper. *See Bedore*, 455 F.2d at 1110. Even if the statute is read more narrowly than its plain words dictate, our interpretive decisions in *Brandow* and *Bedore* when read together stand for this rule: Section 1001 proscribes the willful submission to federal agencies, by one asserting or possessing a claim against or privilege from the United States, of false statements calculated to induce, and having the intrinsic capability of inducing, favorable agency reliance or action. *Compare Brandow*, 268 F.2d at 565, with *Bedore*, 455 F.2d at 1111.

Darrell Goldfine was dispensing controlled substances by virtue of a governmental privilege and was required to register annually to preserve the privilege. [21 U.S.C. § 822(a); 21 C.F.R. § 1301.21 (1974)]. To determine the propriety of reregistration, the Attorney General must consider among others these factors: the degree to which the registrant has avoided improper diversion of controlled substances; his past distribution experience generally; and "such other factors as may be relevant to

and consistent with the public health and safety." [21 U.S.C. § 823(b) and (e)].

To ascertain the degree of statutory compliance and to gather facts for determining whether proposed registration or reregistration is or is not "inconsistent with the public interest" [21 U.S.C. § 823(b) and (e)], the Attorney General has broad authority to conduct administrative inspections. [*Id.* § 880]. It was such an inspection that was conducted here.

To be sure, the DEA agents may have contemplated criminal proceedings when they questioned Darrell Goldfine and they gave appropriate advance warnings. But this fact does not compel us to conclude, as would Judge Ferguson, that "[t]he question of [Darrell Goldfine's] continued status as a registrant was wholly peripheral to the criminal investigation."

The agents conducted their "accountability audit" pursuant to Section 880, which authorizes "administrative inspections." The investigators obtained only an administrative warrant.

Goldfine presented no evidence to overcome the presumptive legitimacy of the administrative procedure (*see, e. g., Phillips v. Fidalgo Island Packing Co.*, 238 F.2d 234, 16 Alaska 338 (9th Cir. 1956)), other than the fact that the agents knew certain criminal acts had occurred. However, as 21 U.S.C. § 883 indicates, mere suspicion on the part of DEA agents of a criminal violation does not mean that the agency will necessarily recommend prosecution. The DEA may give the regulated party "an opportunity to present his views," *id.*, and if satisfied with the explanation may choose not to seek a criminal prosecution by the Attorney General.

Thus I conclude that despite the possibility of criminal prosecution, there was indubitably a legitimate administrative purpose for the investigation and for the questions asked during it.

11. Moreover the *Brandow* position is difficult to confine. If a loquacious defendant continued in the face of overwhelming evidence to deny guilt on multiple occasions, under the *Brandow* theory each incident would constitute a separate offense. The majority does not speak to this issue because the facts do not present the problem, but it is clear that the *Brandow* test has a capacity for mischief which cannot be easily cabined.

Under the "intrinsic capabilities" test of *Brandow*, 268 F.2d at 565, Goldfine's false statement was clearly "material" despite the agents' knowledge of its falsity. This court has in several decisions affirming § 1001 convictions determined that the false statement was *in fact* capable of influencing agency action. *United States v. Deep*, 497 F.2d 1316, 1321–22 (9th Cir. 1974) (en banc); *United States v. Cole*, 469 F.2d 640, 641 (9th Cir. 1972); *Robles v. United States*, 279 F.2d 401, 404 (9th Cir. 1960). Yet since each decision affirmed the conviction on this basis, there was no need to reach the question squarely presented in *Brandow:* Whether a § 1001 conviction may be sustained if the false statement had only the "intrinsic capability" of misleading or defrauding the United States.

That is the question before this court. *Brandow*, being neither expressly nor impliedly overruled, controls the facts of this case.*

---

* Ignoring for the moment the distinction between oral unsworn statements and written statements under oath, *Bedore* and *Brandow* are apparently incompatible on their facts. However, *Bedore* did not involve any "claim or privilege." In *Bedore* we expressly excepted the "claim or privilege" cases from our holding. The "intrinsic capability" test announced in *Brandow* applies with greater force to an obvious "claim or privilege" case, such as this one, than to the very facts before the *Brandow* court.